UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BARBARA STURGIS, Individually and as Administrator of the Estate of David Sturgis, Deceased. | ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO.: 3:19-CV-00440 |
| v. | ) ) | |
| R&L CARRIERS INC., R+L TRANSFER INC., GREENWOOD MOTOR LINES, INC. | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE**

NOW COMES Plaintiff, BARBARA STURGIS, Individually and as Administrator of the Estate of DAVID STURGIS, deceased, through her attorneys, SMITH SERSIC, and PHILLIPS LAW OFFICES, and in response and opposition to Defendants' Motion to Exclude the Testimony of David Gibson (Dkt. 107 & 108) states as follows:

**INTRODUCTION**

Neither the length nor the tenor of Defendants' motion and memorandum carries the point that Mr. Gibson's methodology should be excluded. Countless courts, including the Seventh Circuit, have approved Mr. Gibson's methodology, a fact sufficient to defeat the defendants' motion. At best, Defendants' brief is a recitation of points for "vigorous cross-examination" or "presentation of contrary evidence" under *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 596 (1993). The time for attacking Mr. Gibson's qualifications and presenting "cherry-picked" deposition snippets in an effort to mischaracterize or challenge his conclusions is at trial -- not in

1

a motion to bar under *Daubert*. As Defendants' motion is largely devoid of any authority, legal or forensic, to suggest that an order barring opinion testimony on the disputed issue of damages is appropriate, Defendants' Motion to Exclude should be denied. Indeed, Mr. Gibson has been qualified as a vocational economic expert many times in courtrooms throughout this Circuit.

## FACTS AND ARGUMENT

This case involves the wrongful death of David Sturgis on February 16, 2018 following a collision with Defendant's trailer, which became detached from the tractor pulling it on Interstate 94 in LaPorte County, Indiana. Mr. Sturgis was 53 years old at the time of his death. He was a truck driver by occupation and had been driving trucks for 19 years prior to his death. He was the primary breadwinner for his family and, as such, his wife, Barbara, has a significant claim for loss of earnings.

Plaintiff retained Mr. David Gibson, a vocational economic expert, to estimate Mr. Sturgis's wage loss. Mr. Gibson authored a comprehensive written report, called a Vocational Economic Assessment, explaining his analysis and conclusions. Defendant now seeks to bar Mr. Gibson from testifying in this matter.

### I.  Mr. Gibson's Methodology has Been Accepted by the Seventh Circuit and Numerous Courts Within the Seventh Circuit

Mr. Gibson is a vocational economist. The discipline of vocational economics is a combination of two subspecialties: vocational counselling rehabilitation and financial analysis or economics. (Gibson Dep. 106: 4-9). As Mr. Gibson made clear in his deposition, his methodology, and that of his employer, Vocational Economics, is generally accepted in his field. (Gibson Deposition. 117:14 - 118:13). Mr. Gibson has been qualified as a vocational economic expert at trial in over 250 cases in courtrooms across the country using the same methodology challenged in this motion. Indeed, this same methodology has been approved and validated by the Seventh

Circuit Court of Appeals, the Indiana Court of Appeals, and numerous district courts within the Seventh Circuit.

For example, in *Yong Juan Zhao v. USA*, the Seventh Circuit affirmed an $8.3 million award, in which case Mr. Gibson employed the very same vocational economic methodology Defendants seek to bar in this case. *Yong Juan Zhao v. USA*, 963 F.3d 692 (7th Cir. 2020). In so doing, the Seventh Circuit gave Mr. Gibson's methodology the highest possible approval: "**[w]e cannot think of a more reliable and precise way to estimate the future earnings."** *Yong Juan Zhao*, 963 F.3d at 698 (emphasis added). This alone defeats the premise of Defendants' motion, which is that Mr. Gibson's methodology is so "new or novel" as to be excluded.

Likewise, in *Rossi v. Groft*, the trial court denied Defendant's Motion to exclude Mr. Gibson, holding specifically that "Mr. Gibson's opinions, including his opinion that Rossi is reasonably represented by the median proxy person, are based on sufficient facts and data to be admissible." *Rossi v. Groft,* Case No. 10 C 50240 2013 WL 1632065 (N.D. Ill. Apr. 16, 2013).

Similarly, in *Cox v. Matthews*, the Indiana Court of Appeals held that the trial court had properly allowed Vocational Economic Assessment testimony from Mr. Gibson's partner, Mr. Anthony Gamboa who employs the same methodology, after "making a proper preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." The Court found the methodology scientifically valid and reliable. *Cox v. Matthews*, 901 N.E.2d 14, 18 (Ind. Ct. App. 2009).

A similar outcome was reached in *Thakore v. Universal Mach. Co of Pottstown*. There, the defendant moved to exclude the Vocational Economic Assessment of Mr. Gamboa, making nearly

3

identical arguments as the Defendants herein. In moving to exclude him, the defense in *Thakore* argued that "he lacks the training and education required to give expert opinion because his work has not been peer reviewed; and his methodology was used for this litigation… It is contended that Mr. Gamboa's assumptions are speculative, lack foundation, and are based on unreliable data" *Thakore v. Universal Mach. Co of Pottstown,* 670 F. Supp.2d 705, 730 (N.D. Ill. 2009). The Court swiftly denied defendant's motion, finding that Mr. Gamboa's Vocational Economic Assessment was proper under Rule 702 and *Daubert*.

Finally, in *Barr v. United States*, Mr. Gibson's report and testimony utilizing his vocational economics rationale was found to be a "reliable methodology utilized by the economic expert" in determining lost earnings in a wrongful death case. *Barr v. United States,* 15-CV-01329, 2018 WL 4815413, at *6 (S.D. Ill. Oct. 4, 2018).

A list of Mr. Gibson's testimonial history, notably omitted from Defendants' motion, is attached hereto as Exhibit A as proof of the general acceptance of his methodology.

## II.     Mr. Gibson is Highly Qualified to Proffer Expert Testimony Regarding Plaintiff's Lost Earnings

Plaintiff retained Mr. Gibson to perform a vocational economic assessment whereby he analyzed and calculated the amount of money Mr. Sturgis would have earned but for his untimely death. His expert report is 29 pages in length, complete with an additional 10 pages of supporting calculations and a 5 page bibliography. (Gibson Report). His vocational economic assessment was comprised of three steps:

1.     Determination of Mr. Sturgis "earning capacity" but for his death.
2.     Determination of Mr. Sturgis "worklife expectancy", defined as how long he would reasonably have been expected to earn money.

    **3.**    Determination of Mr. Sturgis's total lifetime loss of earnings, factoring in personal consumption, and reducing the earnings to present cash value.

Defendants' motion to bar is premised on the exception they take not only to Mr. Gibson's qualifications, but also to his calculations at each step. Plaintiff will refute Defendants' arguments in turn below.

    **A.**    **Mr. Gibson is Qualified by Education and Training**

Defendants argue the self-defined, unprecedented baseless point that only a "labor economist" can offer loss of earning testimony in wrongful death cases. The fact that Mr. Gibson, who is not a "labor economist", has been so often qualified by courts to offer probative opinion testimony on lost earnings should be the final word on this issue. Nonetheless, it should be observed that allowing only self-defined "labor economists" to proffer lost earnings opinions in wrongful death cases would be an absurdity, as more than forty (40%) percent of forensic consultants have a background or degree in something other than economics, e.g., finance, business, or accounting. See *Journal of Forensic Economics,* 2017 Survey of NAFE Members: Their Methods, Estimates, and Perspectives; 27(1), 2018, pp. 35-61, 54.

Mr. Gibson's background and degrees certainly give him sufficient foundation for his opinions. As a threshold matter, Defendants' assertion that Mr. Gibson is "not an economist" is incorrect; he does, in fact, have expertise in economics with additional training in vocational assessment. Mr. Gibson has an undergraduate degree from the University of Illinois and an M.B.A. in finance from University of Chicago Booth School of Business. (Gibson Dep. 13: 6-21)(Gibson CV; 1). His degrees in accounting and finance are sub-disciplines in the field of economics. (Gibson Dep. 15: 17-25). Specifically, finance is the sub-discipline of economics that projects cash flows into the future and states them in terms of present cash value. (Gibson Dep. 107: 3-8). Mr.

5

Gibson has drawn upon this training and expertise to practice vocational counseling, a field in which he holds a master's degree from the University of Kentucky, over the past 28 years. (Gibson Dep. 106:17 – 107:18).

### B. Mr. Gibson's Experience Gives Him Requisite Expertise

As a matter of experience, Mr. Gibson works with people with disabilities to sort through the complexities that arise with their condition. This process involves the study and understanding of the physical and cognitive requirements necessary to participate in the national labor market and the impact of medical and psychosocial impacts of disabilities on such participation; Mr. Gibson's methodology involves a reconciliation of how the limitations from disability can impact employment and earnings in future. (Gibson Dep. 14:1 -15:6). He applies his education, training, and work experience as both an accountant in corporate America and a rehabilitation counselor to investigate cash flows of individuals, both in the form of lost earnings and the necessary medical care cost, in order to provide a restatement of those in terms of present cash flow. (Gibson Dep. 106: 16- 107:2). This is precisely the methodology Mr. Gibson is applying in this case -- methodology that has been accepted in countless courts.

### C. Mr. Gibson Is an Established Expert in His Field

Mr. Gibson is an established expert in his field. He has been invited by the United States Census Bureau and American Community Survey Data Users Group ("ACS") to lecture on the very methodology he employs in this case. (Gibson Dep. 64:14 – 66:8; Gibson CV: 1-5). He is, in fact, the only forensic consultant to have presented at the Census Bureau to the ACS Data Users Group. He has likewise presented his methodology in conferences hosted by the United States Census Bureau as recently as 2015 and 2017 and his papers published to the Census Bureau

website as well as distributed to its users. (Gibson CV: 3; Gibson Dep. 64:20 - 65:24). He is again scheduled to present to the Census Bureau in May of this year. As a mark of its acceptance, Mr. Gibson's methodology and rationale at issue is used by others in his field. (Gibson Dep. 109: 9 – 20).

Mr. Gibson has further published numerous peer reviewed articles and presentations in his field, notably in publications by the *Rehabilitation Professional* and the *Journal of Forensic Economics* and *Brain Injury* and *NeuroRehabilitation*. (Gibson Dep. 107: 20- 108:16; Gibson Report. 3-7).

## II.   The Flexible *Daubert* Standard Approves Mr. Gibson's Opinion Testimony

Rule 702 of the Federal Rules of Evidence provides a flexible standard for the admissibility of expert testimony that supports Mr. Gibson's testimony:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."
> 
> *Fed. R. Evid. 702*

The inquiry envisioned by Rule 702 is a "flexible one." *Smith v. Ford Motor Co*., 215 F.3d 713, 719 (7th Cir. 2000). Rule 702 affords the court wide latitude to admit expert testimony that is both relevant and reliable. *Kumho Tire Co*., 526 U.S. at 147 (expanding *Daubert*'s flexible application to technical or non-scientific expert testimony). "For an expert's testimony to be admissible . . . it must be directed to matters within the witness' scientific, technical, or specialized

knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help."

It is not the trial court's role to decide whether an expert's opinion is correct. *Ford Motor Co.*, 215 F.3d at 719. It is rather to act as "gatekeeper" in excluding only those opinions that can be demonstrated as being "junk science." Id. In recognition of this Court's role as "gatekeeper," Mr. Gibson includes in his report a subsection entitled "General Acceptance in the Relevant Community", wherein he addresses the reliability of his methodology and applied principles, complete with citation to peer-reviewed and government sources:

> "The *Daubert* test (as well as the Frye decision (1923) still used in many states) requires experts to apply generally accepted methodology. Proof that the ACS and ASEC data meet this burden is offered through the multiple peer reviewed and other publications cited throughout this document. The "relevant community" is the community of researchers who rely on both ACS and ASEC data to determine both earnings and employment levels for various groups of the population. By way of example, *Farber (2015) (2005)* regularly uses information from the CPS in assessing the experience of displaced workers, while *Fullerton* (1999) uses labor force participation data from the CPS to account for differences among races and the sexes. Further, a thorough examination of the Monthly Labor Review published by BLS [Bureau of Labor Statistics" reveals several forensic and nonforensic authors citing ASEC and ACS data in their research. "Each month, economists, statisticians, and experts from the Bureau join with private sector professionals and State and local government specialists to provide a wealth of research in a variety of fields."

(Gibson Report. 8-9)

These methods are most assuredly not "junk science". Plaintiff would be remiss should he not observe that the *Daubert* standard was handed down in the context of toxic tort litigation, a complex species of cases susceptible to experts offering novel, untested medical causation that earned the shorthand of "junk science." Mr. Gibson presents no "new", "novel" or "untested" medical or scientific theories in the context of lost earnings, as this is a species with a rich and

8

proven history. Indeed, as the U.S. Supreme Court noted a number of years before *Daubert*, in *Jones and Laughlin Steel v. Pfeifer*, a case cited in Mr. Gibson's report, a calculation for lost earnings is admissible despite being an approximation:

> "By its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete confidence, any lump sum represents only a "rough and ready" effort to put the plaintiff in the position he would have been in had he not been injured."

*Jones and Laughlin Steel v. Pfeifer*, 462 U.S. 523 (1983)

Defendants' challenge to Mr. Gibson's testimony is truly on grounds of credibility. However, the question of whether an expert is credible ***or whether his or her theories are correct*** given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) citing *Walker*, 208 F.3d at 589–90 (emphasis added). A *Daubert* inquiry does not enlist the district court to act as fact-finder in deciding these issues. Rather, where expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).

### III. Mr. Gibson's Methodology for Calculating Lost Earnings is Generally Accepted

Mr. Gibson's methodology for calculating lost earnings is broken into three steps: (1) calculation of Mr. Sturgis's lifetime earning capacity; (2) calculation of Mr. Sturgis's worklife expectancy; and (3) reduction of Mr. Sturgis's lifetime lost earnings into present cash value. As

will be shown below, Mr. Gibson's methodology at each step has been admitted in many courts throughout this circuit.

### IV.   Mr. Gibson's Methodology for Calculating *Earning Capacity* is Reliable, Appropriate, and Supported by Authority

As detailed in his report, Mr. Gibson first's step in calculating Mr. Sturgis's lost earnings was to determine Mr. Sturgis' lifetime average earning capacity. (Gibson Report. 2, 12-13). He therefore created, as he does in every case, an "age earning profile" for Mr. Sturgis. (Gibson Report. 3, 13). (Gibson Dep. 114; 10-20). To do this he drew on and applied multiple data sources. The first source was Mr. Sturgis' actual earnings history drawn from his tax returns and W-2s for the years 2013-2017 (Gibson Report. 3). The second source was Mr. Sturgis's individual demographic profile: his age, education and work history. Mr. Gibson's report articulates that he used this methodology specifically because earning capacity is different amongst age, sex, education, and disability. (Gibson Report. 12 – 14). The third source was US Census Bureau data involving millions of people that shows individuals fitting Mr. Sturgis's demographic profile (Male/Age 53/GED/No Disability) typically advance later in their work-lives and display earnings that rise as they age and fall towards the end of their work-lives. Specifically, he used data from the American Community Survey (ACS), a demographics survey program conducted by the Census Bureau that has a sample size of 3 million with a response rate of 97% or more and stands as the largest annual survey in the United States providing statistics on a wide range of important characteristics. (Gibson Report 6).

### V.   Mr. Gibson's Methodology for Calculating *Worklife Expectancy* is Reliable, Appropriate, and Supported by Authority

Mr. Gibson's next step was to calculate Mr. Sturgis' "worklife expectancy." This is not a concept unique to Mr. Gibson nor to the setting of forensic consulting in wrongful death cases, but

has gained acceptance in other contexts. (Gibson Report 13 citing *Millimet et al.*, *Nieswiadomy*, and *Slottje* 2010 and *Millimet, Nieswiadomy*, and *Ryu*, et al. 2003; see also *Brookshire, Cobb*, and *Gamboa* (1987). Mr. Gibson's reports provides a simple and straightforward definition for "worklife expectancy":

> "A worklife expectancy statistically estimates how long a person will work over a lifetime. Predictors of worklife are age, level of educational attainment, gender, and disability status. The likelihood of work is calculated from a specific age through the end of the analysis. Each statistical interval in the worklife pattern represents the joint probability that an individual is alive, in the labor force, and actually employed. The statistical intervals are then summed thereby determining the worklife expectancy in years, the format in which worklife expectancies are typically presented."

(Gibson Report. 26).

"Worklife expectancy" is a product of both probabilities and data input. It is derived by summing a series of joint probabilities of life, participation, and employment (LPE) from a given age through age 89 and correlating that to Mr. Sturgis's earnings profile and the period of time he would have been expected to work but for his death with reference to ACS and US Bureau of Labor Statistics data. The final "worklife expectancy" figure is then presented in a range.

**VI.   Mr. Gibson's Methodology for Calculating *Present Value and Lifetime Loss* is Reliable, Appropriate, and Supported by Authority**

The final step of Mr. Gibson's analysis is the computation for reduction of Mr. Sturgis's lifetime lost earnings into "present cash value." Mr. Gibson uses a "pure offset method" of calculating "present cash value" whereby the growth and discount factors are set as equal to one another (Gibson Report, 19). This method of calculation has been long accepted and is therefore neither "new" nor "novel." As Mr. Gibson notes in his report, "present cash value" in a litigation context refers to the amount of money needed today which, when prudently invested (growth rate), will replace a future stream of lost earnings. (Gibson Report. 15).

11

Defendants' attacks on Mr. Gibson's methodology certainly provide nothing to justify a barring order. Of all the arguments Defendants raise to bar Mr. Gibson, the most baseless is their criticism of Mr. Gibson's "present cash value" analysis and his use of the "pure offset method." Their motion plainly misrepresents Mr. Gibson's deposition testimony when it states the following:

> "Gibson cites no relevant economic authority to support his pure offset method. (Id. 80:17–98:25.) To be sure, Gibson himself admits that his use of the pure offset method is not supported by any written authority in his Report. (Gibson Report, p. 15; Gibson Dep. 80:17–82:3.)"

*Defendants' Memorandum of Law*, p. 22

This entire paragraph is untrue. In truth, when asked specifically for the authority upon which he relies for his use of the "pure offset method," Mr. Gibson responded, "I give a number of citations in my rationale, starting on page 15 and going through page 20." (Gibson Deposition, 80:17-23). Indeed, Mr. Gibson's report cites 14 different sources throughout the present cash value and discount rate sections (including pure offset method) of his report including *Altmann* (2002), *Lawlis and Male* (1994), *Brody* (1982), *Carlson* (1976), *Pelaez* (1989)(1995), *Schwartz and Thornton* (1991) and *Stern* (2005). Mr. Gibson additionally references the Supreme Court's analysis in *Jones and Laughlin Steel Corporation*, wherein the court mandated the use of the "best and safest investments" and a "risk-free stream of earnings", which supports his use of the 91-Day Treasury Bill, a conservative investment vehicle, as an instrument safest from risk. *Jones and Laughlin Steel Corporation*, 462 U.S. at 523. (Gibson Report. 17).

Additionally, Defendants incorrectly state that Mr. Gibson failed to cite a single authority (outside himself) in support of his use of American Community Survey. Worse yet, they misrepresent and outright omit portions of his deposition testimony wherein he provides further

support for methodology. (Defendants' Memorandum p. 18-19). A comparison of Defendants' incomplete transcript versus the actual transcript is set forth below:

**Defendants' Misrepresented Quotation**

Q: Okay. So the answer to the question is, as you sit here today you can't tell me anyone other than yourself who has approved of this methodology; is that right?

A: **No, I can't tell you anyone other than myself who has written on the methodology.**

**Actual Transcript**

```
10    Q.  Okay.  So the answer to the question is, as you sit
11        here today you can't tell me anyone other than
12        yourself who has approved of this methodology; is
13        that right?
14           MR. S.J. PHILLIPS:  Objection.  Form.
15           THE WITNESS:
16    A.  No, I can't tell you anyone other than myself who
17        has written on the methodology.  The methodology
18        was peer reviewed by the Census Bureau and the
19        United -- and the American Community Survey Users.
```

As Mr. Gibson stated in both his report and deposition testimony, his methodology is based in part on a peer-reviewed paper he authored that outlines his rationale for using the ACS to determine lost earnings and cites a number of peer-reviewed sources in support. See *Gibson, David S. "Use of ACS Earnings to Estimate Lifetime Loss of Earning Capacity as a Result of Disability."* Paper presented to the American Community Survey Data Users Conference and the United States Census Bureau. College Park, MD, May 12, 2015. Doi:10.13140/RG.2.1.3212.6887. See also *Gibson, David S., and Erin P. Gibson*. 2017. "Age-Earnings Profiles: Refinement and Application." The Rehabilitation Professional (International Association of Rehabilitation

Professionals) 25 (1): 13-34. Those two papers describe the methodology published by the United States Census Bureau on its website, on which topic he presented at the annual Census conference, and provide a basis for his computations. (Gibson Dep. 54: 18-25).

### 1. Mr. Gibson's Personal Consumption Analysis is Reliable, Appropriate, and is Supported by Authority, Including those Cited in his Report.

Lastly, Defendants take exception to Mr. Gibson's "personal consumption" analysis and refer to it as "speculation." In reality, Mr. Gibson cites directly to *Patton & Nelson's* personal consumption tables from the peer-reviewed Journal of Legal Economics. *Ruble, Michael R., Robert T. Patton, and David M. Nelson*. 2019. Patton - Nelson Personal Consumption Tables 2016-17. Journal of Legal Economics 25 (1-2): 75-89. Indeed, Patton & Nelson's personal consumption tables are comprised of data taken directly from the United States Bureau of Labor Statistics. To criticize the use of this data as "unsound" as Defendants do is to cast doubt on the entire United States Census process as a whole. As Mr. Gibson notes, data from the US Bureau of Labor Statistics is typically and reasonably relied upon by experts in his field. (Gibson Deposition. 115: 3-14). Defendants have provided this court with no authority to intimate the opposite.

Moreover, Defendants, again without authority, criticize Mr. Gibson for stopping the "personal consumption" analysis at the date of Mr. Sturgis' projected retirement. As Mr. Gibson testified in his deposition, he was asked to value Mr. Sturgis' loss of earnings - Mr. Sturgis did not have retirement benefits like a 401(k) or union pension. As such, personal consumption is only applied to lost earnings. Defendants essentially ask Mr. Gibson to double dip against Mr. Sturgis

by factoring personal consumption into non-existent retirement benefits.[1,2] (Gibson Deposition. 68:18- 70:03; 114: 2-9).

### VII. Defendants are Free to Cross-Examine Mr. Gibson on his Methodology and Conclusions

While Defendants criticize every step of Mr. Gibson's analysis as well as his ultimate conclusions, this is not grounds for barring their admission, but rather for allowing the jury determine the amount of damages that will reasonably compensate Plaintiff. Defendants remain free to attack the weight of the evidence for Mr. Gibson's opinions, the weakness of which may be uncovered through cross-examination or presentation of contrary evidence. As the Second Circuit has stated, even in those instances where an expert's opinions are susceptible to challenge, **"[d]isputes as to the strength of [an expert's] credentials . . . methodology, or lack of textual authority for his opinion go to the weight**, **not the admissibility, of his testimony.** *McCullock v. H.B. Fuller, Co*. 61 F. 3d 1038, 1044 (2d Cir. 1995)(emphasis added).

Furthermore, Rule 702's requirement that the court determine that the expert "used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) citing *Stollings v. Ryobi Technologies, Inc*., 725 F.3d 753, 765 (7th Cir. 2013). The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to

---

[1] Defendants' additional criticisms of Mr. Gibson for calculating fringe benefits like social security and unemployment insurance are unfounded. These are legally required contributions. Mr. Sturgis did not have retirement contributions like 401(k) or union pension.

[2] Defendants also take issue with Mr. Gibson's alleged "failure to account for critical case-specific factors like Mr. Sturgis' occupation as a truckdriver" despite the fact that Mr. Gibson mentions that specific factor numerous times throughout his report. In fact, Mr. Gibson provides his supporting computations for this calculation on pages 27 through 29 of his report.

assessing the reliability of the methodology—the framework—of the expert's analysis. *Id.* at 808. This means that Defendants are free to criticize Mr. Gibson's methods but his decision to do so reflects not on the admissibility of his testimony, but rather its weight.

Lastly, Defendants cite multiple, self-serving articles authored by established defense expert witnesses to suggest that Mr. Gibson's analysis "is not the product of conventional economic theory." (*Ostrofe* and *Ireland*). These are nothing more than conclusory statements made by partisan actors who advertise their services on the internet. See Exhibit B, Seak Expert Witness Profile of Nora Ostrofe. These so-called experts have not been established as authoritative in their field. Their "criticisms" should therefore have no bearing on the *Daubert* analysis.

### Defendants' Authority is Distinguishable and Inapplicable

Much of Defendants' authority that alleges to refute Mr. Gibson's methodology is distinguishable and inapplicable because it relates not to lost earnings - the subject matter involved herein - but rather to standard of care and causation testimony in medical negligence cases. These cases are evaluated under different facts and lead to different conclusions - they are simply a different legal and factual framework. As such, a large number of the Defense cases, including *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010), *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016), *U.S. v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019), *Robinson v. Davol Inc.*, 913 F.3d 690, 692, 695 (7th Cir. 2019), do not support Defendants' defendants unprecedented extreme request to bar Mr. Gibson's testimony.

### CONCLUSION

Mr. Gibson is qualified to offer expert testimony about Mr. Sturgis' loss of lifetime earnings and the jury's understanding of this disputed issue will be best served by weighing his testimony. The defendants' desire to exclude Mr. Gibson emanates not from his methodology, but

16

instead from disdain for the conclusions he reaches and the monetary values he calculates. As this Court is well aware, that is certainly not a basis for exclusion.

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this honorable Court deny Defendants' Motion to Exclude Mr. David Gibson (Dkt. 107 & 108) in its entirety.

Dated: March 2, 2021                                       Respectfully Submitted,

/s/ *Stephen Phillips*

Stephen D. Phillips
Terrence M. Quinn
Stephen J. Phillips
**PHILLIPS LAW OFFICES**
161 N. Clark Street, Suite 4925
Chicago, Illinois 60601
T: (312)346-4262
F: (312)346-0003
sphillips@phillipslegal.com
tquinn@phillipslegal.com
sjphillips@phillipslegal.com


Kevin C. Smith
**SMITH SERSIC**
9301 Calumet Avenue, Suite 1F
Munster, IN 46321
T: (219) 933-7600
F: (219) 836-2848
ksmith@smithsersic.com

*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service.

**Edward W. Hearn** hearne@jbltd.com
**Catherine Breitweiser-Hurst** breitweiserhurstc@jbltd.com
**Greg Conforti** confortig@jbltd.com


By: /s/ Stephen Phillips

**PHILLIPS LAW OFFICES**
161 N. Clark Street, Suite 4925
Chicago, Illinois 60601
T: (312)346-4262
F: (312)346-0003
sjphillips@phillipslegal.com

*One of the Attorneys for the Plaintiff*