UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA STURGIS,

        Plaintiff,

    v.                             CAUSE NO. 3:19-CV-440 DRL-MGG

R & L CARRIERS, INC.,
R & L TRANSFER, INC., and
GREENWOOD MOTOR LINES, INC.,

        Defendants.

## OPINION & ORDER

David Sturgis died in a tragic trucking accident on Interstate 94. Barbara Sturgis filed this wrongful death action, individually and as administrator of her late husband's estate. She tendered David Gibson, a partner at Vocational Economics, Inc., to testify about the decedent's future lost income. The defense moved to exclude this testimony as unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The court now grants the motion.

## BACKGROUND

The defendants admit fault for the accident, so this case proceeds solely on the issue of damages [ECF 101 at 1]. For that purpose, Ms. Sturgis retained David Gibson to develop an estimate of her late husband's lost earning capacity because of his death. Mr. Gibson opines that the loss lay within $267,501 to $379,398 when accounting for personal consumption [ECF 108-1 at 5].

Mr. Gibson has a bachelor's degree in accounting and master's degrees in both rehabilitation counseling and finance [*Id.* 45]. He describes his degrees as "degrees in subdiscipline economics," with "finance being the discipline that explicitly projects cash flows in the future" [ECF 108-2 at 15]. Since 1993, he has worked as a senior analyst at Vocational Economics, Inc., where he previously held the positions of president (2007-2011) and chief operating officer (1993-2007) [ECF 108-1 at 45]. In his

current role, Mr. Gibson "provide[s] assessments of lost earnings due to death, disability, or loss of employment" and "consult[s] with attorneys and experts on analysis and application of disability statistics of earnings, employment, and worklife expectancy" [*Id.*].

Mr. Gibson completed a vocational economic assessment. He says the "vocational economic rationale presents both the philosophy and the methodology employed in assessing the loss" and is the "standard employed by [his] firm in conducting a vocational economic assessment" [*Id.* 5]. His method involves three steps: first, calculating the annual earning capacity; second, calculating the worklife expectancy; and third, calculating the present value of the loss [*Id.* 6, 14].

Annual earning capacity answers "how much the person will make per year" [ECF 108-2 at 16]. Mr. Gibson considered Mr. Sturgis' annual earning capacity to be $43,906 [ECF 108-1 at 7]. He arrived at this number based on Mr. Sturgis' "age, education, and previous work experience" and his average earnings from 2013 to 2017, excluding 2016.[1] Mr. Gibson adjusted this number to account for Mr. Sturgis' "age earnings profile," which assumes "typical growth patterns of males with a GED or an alternate credential and no disability" [*Id.*].

Worklife expectancy answers "how many years" the person is going to work [ECF 108-2 at 17]. Mr. Gibson considered Mr. Sturgis' worklife expectancy in terms of a range: 9 to 12.6 years [ECF 108-1 at 8]. The low end of the range, 9 years, was based on statistics for "an average male with a GED or an alternate credential and no disability" [*Id.* 7]. The high end of the range, 12.6 years, was based on the fact that Mr. Sturgis had "historically defied the statistical average of employment for his cohort" (having worked as a truck driver for 18 years), and "could reasonably have been expected to continue had his death not taken place" [*Id.*].

---

[1] Mr. Gibson excluded 2016 because Mr. Sturgis was off work for 9-10 months during that year when his trucking company lost a major contract [ECF 108-1 at 7, n.2; ECF 108-2 at 17-18].

To calculate the present value of the loss, Mr. Gibson "assume[d] that future increases in real wage growth will be offset by the real rate of interest or discount over the remaining worklife expectancy" [*Id.* 8]. Here, he found the gross loss to be somewhere between $426,636 (based on a worklife expectancy of 9 years) and $605,101 (based on a worklife expectancy of 12.6 years) [*Id.*]. Additionally, he used data from the Consumer Expenditure Survey published by the U.S. Bureau of Labor Statistics to provide a range of loss that accounts for personal consumption [*Id.*]. That range is $267,501 to $379,398.

## STANDARD

Expert opinions must be reliable and helpful. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Appreciating that trial instructions tell jurors to weigh opinion testimony the same as that of ordinary fact witnesses, *see, e.g.,* 7th Cir. Pattern Civ. Jury Instr. 1.21 (rev. 2017), an expert nonetheless enjoys considerable latitude when testifying, *see* Fed. R. Evid. 702-704, and jurors often tend to heed that testimony because of the expert's aura of authority and knowledge, *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018). So the court gatekeeps beforehand. The court decides the testimony's reliability and fitness before the jury ever hears it. *Daubert*, 509 U.S. at 594. This duty extends to all proposed expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education," (2) the testimony is "based on sufficient facts or data," (3) the testimony is "the product of reliable principles and methods," and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Although the analysis remains at all times flexible, *Daubert*, 509 U.S. at 594, these fundamentals at the start can be restated formulaically just for ease of understanding:

*Opinion + Qualifications + Facts + Validation + Fit = Admissible Expert Testimony.*

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

With opinion in hand, a witness must have credentials or experience that truly denotes the individual as an expert in the relevant field. Experts draw their truths from specialized "experience confessedly foreign in kind to [the jury's] own." Hon. Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 54 (1901). Scientific knowledge may come from professional degrees or use of the scientific method. Other knowledge may presuppose that a person has spent significant time gaining hands-on experience without need of formal education or laboratory work. However obtained, qualifications must provide a foundation for an expert to answer the specific question. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (allowing physician to opine about effects of vomiting on body but not pharmacological effects of drugs on heart); *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (allowing agent to opine on *modus operandi* of narcotics dealers based on training and experience in counter-surveillance). Knowledge can be developed in myriad ways. It just can't be "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

An opinion witness must next have a sound factual basis before being declared an expert. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590. Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call *ipse dixit*). *See Kumho Tire*, 526 U.S. at 157; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony must be based on sufficient and known facts. Fed R. Evid. 703; *Daubert*, 509 U.S. at 590; *see, e.g.*, *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (evidence of one sale was an insufficient basis to calculate an average of sales over twenty years); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (excluding expert testimony because the "mere existence of a temporal relationship" was an unreliable basis to show a causal relationship between medication and symptoms).

Expert testimony must also originate from reliable principles and methods. Fed. R. Evid. 702. Scientific testimony may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. These concerns may or may not bear on technical or experience-based opinions, appreciating that the analysis remains ever nimble to meet their substance, and so long as the witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *accord Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007).

Expert opinion must last fit the case. Opinions must be tied to case facts and issues. *Kumho Tire*, 526 U.S. at 150. The court must determine whether an expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. The opinion must help the jury decide an issue of consequence. Expert testimony that "does not relate to any issue in the case is not relevant, and . . . non-helpful." *Id.* at 591. A court should exclude testimony unless it speaks, without confusing or misleading the jury, on a relevant issue that the jury must decide. *See* Fed. R. Evid. 403 and 702; *see, e.g., Hartman v. EBSCO Indus.*, 758 F.3d 810, 819 (7th Cir. 2014) (excluding testimony as unhelpful because expert's opinion on alternate design did not assist the jury to decide causation); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 897 (7th Cir. 2011) (excluding testimony as unhelpful because parties agreed to issue). This is what is commonly called fit. *See Daubert*, 509 U.S. at 591.

In short, the Federal Rules of Evidence strike a balance between two competing concerns: the apprehension for the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Id.* at 596. While preserving that balance, the *Daubert* analysis is not a substitute for cross-examination, contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

The court needn't conduct an evidentiary hearing here. No party has requested one in this case. The briefing, report, exhibits, and deposition testimony also permit the court to rule. *See, e.g., Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998).

DISCUSSION

Mr. Gibson's vocational economic opinion is unreliable. *See Liebhart v. SPX Corp.*, 917 F.3d 952, 963 (7th Cir. 2019). Though it may be true that lost earnings "can never be predicted with complete confidence," *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983), a proposed expert's assessment of lost earnings must be supported by a reliable methodology, *see Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). The defendants in part argue that Mr. Gibson isn't qualified to opine on future lost income because he isn't an economist, but their main point is that Mr. Gibson's methodology is unreliable. As they put it, Mr. Gibson mistakenly conflates reliable data for reliable methodology when these remain two separate inquiries. *Id.* (reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology").

At the outset, the defendants characterize Mr. Gibson as unqualified to testify as an expert because he isn't an economist. The question isn't whether Mr. Gibson is qualified in general, but whether his qualifications provide the foundation for him to answer a specific question. *See Gayton*, 593 F.3d at 617-18. The defendants seem to argue that only a labor economist could estimate the value of future lost earnings based on labor market data. They say Mr. Gibson is not a labor economist. The defense's argument is too strong a straitjacket.

Mr. Gibson lacks a degree in labor economics. He admits he would defer to labor economists as to the materials they rely on or find to be authoritative, but he has two degrees in subdisciplines of economics—accounting and finance. Furthermore, he has worked as a senior analyst at Vocational

6

Economics since 1993, where he has been providing assessments of lost earnings due to death, disability, or loss of employment, aside from older financial analyst work. An expert's qualifications can be developed in different ways, including through hands-on experience. Mr. Gibson's specialized knowledge comes through his experience in projecting future lost earnings and work at Vocational Economics over nearly 30 years. *See, e.g., Gayton*, 593 F.3d at 617-18; *United States v. Truitt*, 938 F.3d 885, 889-90 (7th Cir. 2019) (same); *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).

The defendants also argue that Mr. Gibson's methodology isn't reliable, and here they gain traction. They say his methodology is not generally accepted in the economics community, it has not been peer reviewed, and it lacks any economic industry support. *See Ervin*, 492 F.3d at 904 (laying out guideposts for determining reliability); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779-80 (7th Cir. 2017) (outlining benchmarks relevant in assessing reliability). A qualified expert must employ a recognized methodology that uses the common tools of the discipline. *See American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817-18 (7th Cir. 2010) (one peer-reviewed publication isn't enough to indicate theory has been generally accepted); *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) ("experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data").

At a high level, Mr. Gibson's method may not seem unusual. He calculates the decedent's annual earning capacity and then his worklife expectancy. Mr. Gibson calculates the "real growth rate" of the earnings and the "real discount rate" of the earnings to determine the present value of the loss. "There are a number of methods available for determining the growth rate applied to predict what the decedent's income would have been in the future and for determining the discount rate applied to reduce that future income to its present value." *Ollis v. Knecht*, 751 N.E.2d 825, 830 (Ind. Ct. App. 2001). Of course, the court's focus remains on the reliability of his methodology, not his conclusions. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007).

7

Mr. Gibson includes a section in his expert report on "meeting *Daubert* and *Frye* criteria" where he attempts to show his methodology's reliability [ECF 108-1 at 11-14]. Yet again and again, he focuses on why the underlying data for his calculations are reliable without explaining how the methodology is reliable. *See Gopalratnam*, 877 F.3d at 780-81 (distinguishing the validity of the methodology from the quality of the data used in applying the methodology). In a subsection on "testing," for instance, he says, "data from the [American Community Survey] and [Annual Social and Economic Supplement] are produced and extensively tested by the U.S. Department of Commerce, Bureau of the Census," without commenting on how his methodology is tried and true [ECF 108-1 at 11]. In the next subsection on "peer review and publication," he says, "[u]se of the underlying ACS and ASEC data to measure earnings and employment is the subject of multiple published and peer reviewed articles," without sharing whether his methodology that employs the data has been peer reviewed [*Id.* 11-12]. In a subsection on "general acceptance in the relevant community," he says, "[p]roof that the ACS and ASEC data meet this burden is offered through the multiple peer reviewed and other publications cited throughout this document" [*Id.*]. In short, he cites sources that use the same data, but not validating his methodology.

Mr. Gibson's method has three main steps: he calculates annual earning capacity, then worklife expectancy, then the present value of the loss. To calculate Mr. Sturgis' annual earning capacity, Mr. Gibson looked at Mr. Sturgis' average earnings over a five-year period (excluding 2016) and converted these earnings into 2020 dollars. Mr. Gibson excluded 2016 because Mr. Sturgis was off work for 9-10 months during that year when his trucking company lost a major contract. Stated in 2020 dollars, Mr. Gibson's calculation resulted in an annual earning capacity of $45,244.

Mr. Gibson adjusted this figure based on Mr. Sturgis' age-earnings profile [ECF 108-2 at 39]. The age-earnings profile was based on certain characteristics—that Mr. Sturgis was male, had a GED, and had no disability [*Id.* 40]. Mr. Gibson used American Community Survey data to create this age-

earnings profile [*Id.* 45]. He examined the median earnings for men at age 53 whose highest level of education was a GED and who had no disability [*Id.* 46-47]. He compared the median earnings number as it changed year to year and then applied that same percentage change to Mr. Sturgis' earnings [*Id.* 48]. This adjustment resulted in a lifetime average earning capacity of $43,906 per year [ECF 108-1 at 7]. This decrease occurred because Mr. Sturgis died at the age 53, so he had already hit the top part of the curve for age earnings [ECF 108-2 at 42].

There seems nothing troubling about the first part of this step—looking at Mr. Sturgis' average earnings over a five-year period and reasonably excluding Mr. Sturgis' earnings in 2016—but Mr. Gibson hasn't sufficiently established the reliability of his method that adjusts this figure based on a limited age-earnings profile. For instance, this profile omits occupation and even part-time or full-time employment status. A person with a GED could procure a great host of jobs—from developing entrepreneurially one's own business to working more humbly in a pickle factory as a line worker, or from jobs that likely have staying power in future markets to jobs that forecasts suggest may reasonably wane. Calculating a profile without regard to how earnings could change over time or in a particular profession myopically limits the analysis.

Mr. Gibson explains his rationale for assessing annual earning capacity in his report [ECF 108-2 at 50-51; ECF 108-1 at 16-17]. In that section, he cites two articles, but neither article supports the methodology that he uses to make these calculations [ECF 108-2 at 52-54]. The only articles he cites to support his method he or his business partner authored [*Id.* 54]. These self-justifying articles lack peer review from economists or labor economists [*Id.* 56, 63-66]. A 2017 article was reviewed by individuals with credentials in rehabilitation, but rehabilitation counseling is "a discipline that deals with disability," and in the words of Mr. Gibson, "it plays little role in this case" [*Id.* 14]. Mr. Gibson concedes no one really but him has written to support his methodology [*Id.* 62]. A method so avant-garde that it lacks any meaningful independent support or corroboration, particularly in the field of

economic analysis, is ripe for skepticism. *See American Honda*, 600 F.3d at 817-18; *see also Ollis*, 751 N.E.2d at 830 (excluding damages expert in wrongful death case who couldn't name peer-reviewed support of a "mirror image" approach); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (expert's testimony was improperly admitted when his theory was "unsupported by any article, text, study, scientific literature or scientific data produced by others in the field"). Omitting something so plain as a person's occupation or employability in calculating lost earning capacity makes this method unreliable. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized [] method and are reliable and relevant").

Mr. Gibson's method for calculating worklife expectancy fares worse. Once more he worryingly omitted Mr. Sturgis' occupation as a truck driver, though his own authority recommends occupation be considered. [ECF 108-1 at 21, citing Michael T. Brody, *Inflation, Productivity, and the Total Offset Method of Calculating Damages for Lost Future Earnings*, 49 U. Chi. L. Rev. 1003, 1004 (1982)]. He included social security income as part of Mr. Sturgis' earning capacity, though this too conflicts with his cited authority [ECF 108-2 at 69; ECF 108-1 at 8, citing Michael R. Ruble *et al.*, *Patton-Nelson Personal Consumption Tables 2016-17*, 25 J. Legal Econ. 75, 89 (Sept. 2019)]. He did so despite ignoring time after retirement when reducing for personal consumption—thereby seeming to inflate earning capacity artificially [ECF 108-2 at 69, 114]. Deviating from standard methods without reasonable justification likewise makes his approach unreliable. *See Kumho Tire*, 526 U.S. at 152 (witness must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field"); *see, e.g., Truitt*, 938 F.3d at 889 (7th Cir. 2019) (excluding expert whose methods "deviated dramatically from the methods of other experts in the field"); *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 770 (7th Cir. 2014) (excluding expert whose method "deviated substantially from the recognized [] practices that he described in his reports").

Rather than endorse the method here, economists have criticized it. *See, e.g.*, N.C. Ostrofe, *Does the Vocational Economic Rationale Have Merit?—An Appraisal*, 20 J. Legal Econ. 61, 71 (July 2014) (describing the method as "not universally accepted in forensic economic and vocational communities" and the subject of "considerable controversy"). In fairness, much of this criticism focuses on this method's use in disability cases (not the issue here), but it underscores the problem of applying "broad survey data to the circumstances of a specific individual" without pertinent individual considerations—a glaring issue that makes Mr. Gibson's method here likewise unreliable. *See id.* at 68-69 (citing *Ayers v. Robinson*, 887 F. Supp. 1049, 1061 (N.D. Ill. 1995) (excluding testimony of an expert in part because his calculations were based on "the value of a statistical life—a nameless, faceless member of society")). Ms. Sturgis calls this and other criticism partisan—written by those who have not been established as authoritative in their field—but her source lends little heft to this point.[2]

Mr. Gibson's calculations of an age-earnings profile and worklife expectancy relied on broad, underlying survey data. He says "[t]he large sample sizes of the ACS and ASEC surveys assure low standard error rates" [ECF 108-1 at 12]. Just because the data resists error doesn't mean the method by which they are input proves reliable. Using a method unrooted in a decedent's occupation or artificially inflating income contrary to an opinion witness's own guiding authorities necessarily amplifies the risk of error beyond a reliable and recognized economic method.

Mr. Gibson's third step calculated the present value of the loss. At this stage, he made adjustments based on a "real growth rate" and a "real discount rate" [ECF 108-2 at 75]. The real growth rate refers to the "average economic change in earnings going into the future" [*Id.* 76]. Mr.

---

[2] For instance, Ms. Sturgis attaches a profile of Nora C. Ostrofe from the SEAK Expert Witness Directory [ECF 112-2]. SEAK, Inc. trains expert witnesses and provides an online directory of over 2,000 expert witnesses. *See* SEAK Expert Witness Directory, https://www.seakexperts.com/ (last visited Aug. 12, 2021). Its profile never accuses her of being partisan; and, far from saying she lacks credentials, it shows she specializes in economic loss and such valuations. It would seem odd to characterize Ms. Ostrofe as incapable of industry comment merely because she advertises as an expert witness when Mr. Gibson's entire practice seems tied to litigation work [ECF 108-2 at 10].

Gibson measured this "by using the average rate of growth in compensation in the United States as measured by the U.S. Bureau of Labor Statistics" [*Id.*]. This data is based on information for all workers [*Id.* 77-78]. Mr. Gibson didn't look at the wage growth rate for truckdrivers [*Id.* 78]. Instead, based on information for all workers, he used a real growth rate of one percent [*Id.* 77]. The real discount rate is based on "a 91-day Treasury bill from the U.S. Federal Reserve Board" [*Id.* 78]. He used a real discount rate of one percent [*Id.* 78-79]. Because each rate was one percent, he generated a "pure offset" conclusion [*Id.* 76]. In other words, it was a wash [*Id.* 80].

The defendants say Mr. Gibson's method isn't supported by any written authority in his report [*Id.* 80-82]. Ms. Sturgis says this is untrue. In her response, she argues that Mr. Gibson cites fourteen different sources to support this method. Some of these sources discuss a "total offset" (whereby the growth rate and discount rate cancel each other out). *See, e.g.,* Frank Lawlis and Robert Male, *Methodological Issues: Interest Rate and Wage Growth Forecasting,* 4 J. Legal Econ. 55, 60 (1994) ("Perhaps the total offset method is the least potentially biased mechanism to use for present value calculations"); Brody, 49 U. Chi. L. Rev. at 1025 ("Absent strong evidence that the inflating and discounting factors no longer offset each other, the total offset method should continue to produce accurate awards."). Whether this constitutes the same method that Mr. Gibson uses here, just under a different name, and whether it then has an ostensible measure of acceptance, it does nothing to save the method's unreliability at other steps.

Ms. Sturgis says this circuit affirmed the use of Mr. Gibson's methodology in *Zhao v. United States*, 963 F.3d 692 (7th Cir. 2020). *Zhao* wasn't addressing a *Daubert* challenge to Mr. Gibson's qualifications or methodology. In *Zhao*, this circuit decided whether the district court used a proper method to calculate the future lost earnings of a five-year-old child, and the district court primarily relied on figures from the government's vocational expert to do so. *Id.* at 697-98. The district court used Mr. Gibson's estimation of the number of years that the child would be in the workforce when

the government's expert left this silent. That wasn't an endorsement of Mr. Gibson's method, just blessing of the district court's use of one estimate within that method for its conclusions.

Putting *Zhao* aside, Ms. Sturgis says countless courts have approved Mr. Gibson's methodology. Mr. Gibson submitted a testimony report that shows that he has testified 373 times at depositions and 68 times in court from January 1, 2016 through April 16, 2020 [ECF 112-1]. Ms. Sturgis cites a handful of cases when courts have admitted or approved Mr. Gibson's firm's method.[3] Ultimately, though, the varied circumstances of these cases make them less persuasive here. Nor is there any indication that his method suffered from the defects that exist here.[4] In each case, the burden remains on the proponent of the expert testimony to show why it is admissible. *See Varlen*, 924 F.3d at 459; *Ervin*, 492 F.3d at 904 (reliability is a "case-by-case determination"). Based on this record, this burden hasn't been met.

Ms. Sturgis argues that the defense remains free to attack the weight of Mr. Gibson's opinions on crossexamination or through the presentation of contrary evidence at trial. This point misses the mark. Here, the court is excluding Mr. Gibson because Ms. Sturgis hasn't established the reliability of his methodology by a preponderance of the evidence. The court won't admit an expert whose

---

[3] Mr. Gibson and Dr. Anthony Gamboa work at the same firm and reportedly use the same method for creating vocational economic assessments.

[4] In *Rossi v. Groft*, 2013 U.S. Dist. LEXIS 54552, 8-10 (N.D. Ill. Apr. 16, 2013), for instance, the court didn't exclude Mr. Gibson because he provided reasons why the "median person" was a reasonable proxy for the plaintiff there. This reason, based on the plaintiff's young age and the fact that he was seeking better paying employment at the time of the injury, *id.* at 9-10, isn't present here. In *Cox v. Matthews*, 901 N.E.2d 14, 18 (Ind. Ct. App. 2009), the court affirmed admission of testimony from Dr. Gamboa, Mr. Gibson's business partner. This case isn't helpful because Dr. Gamboa's testimony was based on the medical findings of another doctor who had previously testified. *Id.* at 22. In *Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp.2d 705, 729-30 (N.D. Ill. 2009), the court was presented with a motion to exclude Dr. Gamboa, not Mr. Gibson. The court denied the motion to exclude in part based on Dr. Gamboa's "education and experience…to account for the admitted limitations of the study." *Id.* at 730. Dr. Gamboa isn't the proffered expert in this case. In *Barr v. United States*, 2018 U.S. Dist LEXIS 171827, 17-18 (S.D. Ill. Oct. 4, 2018), the court described Mr. Gibson's method for calculating the wage loss of the decedent as reliable, but there is no indication that the defendant challenged the admissibility of Mr. Gibson as an expert.

principles and methods aren't reliable. *See* Fed R. Evid. 702(c); *see also ATA Airlines, Inc. v. Federal Exp. Corp.*, 665 F.3d 882, 889 (7th Cir. 2011). The issue here is Mr. Gibson's method, not his conclusions. *See Manpower*, 732 F.3d at 806.

## CONCLUSION

David Gibson's opinion here is unreliable under *Daubert* and Rule 702, so it must be excluded. While he is not without credentials or ability to serve in the right case, this is not that case. Accordingly, the court GRANTS the motion to exclude his testimony [ECF 107].

SO ORDERED.

August 13, 2021                          *s/ Damon R. Leichty*
                                         Judge, United States District Court

14