Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MARIA GONZALEZ, as mother and   )
next friend of, M.G., a minor,   )
  )
               Plaintiff,   )
  )
        vs.   )   No. 1:13-cv-03630
  )
SOUTHWEST AIRLINES,   )
  )
            Defendant.   )

The deposition of DAVID GIBSON, called by the Defendant for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Joanne M. Gagliardi, a Certified Shorthand Reporter and Registered Professional Reporter, at Suite 1750, 208 South LaSalle Street, Chicago, Illinois, on Wednesday, July 29, 2015, at the hour of 9:00 o'clock a.m.

MAGNA LEGAL SERVICES

(866)624-6221

www.MagnaLS.com



EXHIBIT B

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

## Page 2

APPEARANCES:

RAPOPORT LAW OFFICES, P.C.
BY MR. BRYAN W. HERNANDEZ
20 North Clark Street
Suite 3500
Chicago, Illinois 60602
312-327-9880
bhernandez@rapoportlaw.com

    appeared on behalf of Plaintiff;

MERLO, KANOFSKY, GREGG & MACHALINSKI, LTD.
BY MS. JENNIFER L. SMITH
208 South LaSalle Street, Suite 1750
Chicago, Illinois 60604
312-553-5500    fax 553-1586
jls@merlolaw.com

    appeared on behalf of Defendant.

## Page 3

### I N D E X
### DAVID GIBSON

|  | PAGE |
| --- | --- |
| MS. SMITH: | |
| DIRECT EXAMINATION: | 4 |
| REDIRECT EXAMINATION: | 75 |
| MR. HERNANDEZ: | |
| CROSS EXAMINATION: | 71 |

### INDEX TO EXHIBITS

| DESCRIPTION | PAGE |
| --- | --- |
| Group Exhibit No. 1  Curriculum Vitae with Testimony Report | 4 |
| Exhibit No. 2    July 8, 2014 Cover Letter with Vocational Economic Assessment | 4 |
| Exhibit No. 3    July 15, 2015 Vocational Economic Assessment | 4 |
| Exhibit No. 4    Life Care Plan of Dr. Missun | 4 |
| Exhibit No. 5    Curriculum Vitae | 4 |
| Exhibit No. 6    Gibson File Review Notes | 4 |
| Exhibit No. 7    Tables of Data | 77 |
| Exhibit No. 8    Evaluee Interview Form | 77 |
| Exhibit No. 9    Life Care Plan | |

## Page 4

1    (Deposition Exhibit No. 1 through 6
2    were marked for identification.)
3    (Witness sworn.)
4    DAVID S. GIBSON,
5  called as a witness on behalf of the Defendant, having
6  been first duly sworn, was examined and testified as
7  follows:
8    DIRECT EXAMINATION
9  BY MS. SMITH:
10   Q   Mr. Gibson, can you please state your name
11  and spell your last name for the record.
12   A   My name is David S. Gibson, G-i-b-s-o-n.
13    MS. SMITH:  Let the record reflect this is a
14  discovery deposition taken pursuant to notice and
15  agreement of all parties as to the time and place.
16  This deposition is taken pursuant to the
17  applicable Federal Rules of Civil Procedure and
18  any applicable Rules of the United States District
19  Court for the Northern District of Illinois where
20  this action is pending.
21    Before we get started I just want to
22  make an objection for the record.  Mr. Gibson
23  initially provided the plaintiff's attorney,
24  Dennis Kellogg with a Vocational Economic

## Page 5

1  Assessment on July 8, 2014.  This report was
2  produced to Southwest attorneys on February 19,
3  2015.  On March 5, 2015 Judge Holderman set an
4  expert discovery deadline of April 2, 2015.  This
5  can be found in ECF order 81.
6    Mr. Gibson then provided another
7  Vocational Economic Assessment on July 14, 2015 to
8  plaintiff's counsel, Joshua Weisberg of the
9  Rapoport Law Office.  Mr. Gibson also provided for
10  the first time a medical cost summary on July 15,
11  2015 to Joshua Weisberg.  These reports were
12  provided to Southwest counsel on July 15 of 2015.
13    Southwest objects to both the July 14,
14  2015 Vocational Economic Assessment and July 15,
15  2015 Medical Cost Summary as untimely.  Both of
16  these reports were produced over three months past
17  the court expert deadline.  In addition these
18  these reports are supplements to Mr. Gibson's July
19  8, 2015 report.  All of the information relied
20  upon by Mr. Gibson in his July 2015 reports were
21  available prior to the April 2, 2015 expert
22  deadline.  All of Mr. Gibson's reports could have
23  been completed prior to the April 2, 2015
24  deadline.



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

## Page 6

1    Southwest is not waiving any objections
2  it has relating to these reports by taking the
3  deposition today. We're just taking it in the
4  interest of timeliness, given the court's August
5  31, 2015 oral expert discovery deadline.
6  BY MS. SMITH:
7    Q    Mr. Gibson, my name is Jenny Smith, and I
8  represent Southwest Airlines in this matter. I'm going
9  to be asking you some questions today regarding your
10  involvement in this case and the reports you have
11  written, okay? Fair enough?
12    A    Okay.
13    Q    You've given numerous depositions before,
14  correct?
15    A    I have.
16    Q    Fair to say that you give more than 50
17  depositions per year on average?
18    A    I believe it's 60 to 65, yes.
19    Q    And that doesn't count trial testimony,
20  correct?
21    A    I'm sorry?
22    Q    That doesn't include trial testimony,
23  correct?
24    A    That's correct. In addition I give another

## Page 7

1  10 to 15 trial testimonies per year.
2    Q    Where do you currently maintain a business
3  address?
4    A    At 180 North LaSalle Street, Suite 3700 here
5  in Chicago 60601.
6    Q    And what business is that with?
7    A    Vocational Economics, Inc.
8    Q    Where do you currently reside?
9    A    ████████████
10    Q    What's the address?
11    A    ████████████
12    Q    And you have been retained to provide
13  opinions in this matter, correct?
14    A    I have.
15    Q    Do you know when exactly you were retained?
16    A    I don't keep a diary, per se; but looking
17  back at the fee agreement in this case, I note that the
18  original one with Mr. Kellogg was generated on February
19  18, 2014, and that's usually generated within a day
20  after we first learn of the case.
21    Q    You indicated you were retained by Dennis
22  Kellogg, correct?
23    A    Yes.
24    Q    What was your understanding as to why you

## Page 8

1  were initially retained in this matter?
2    A    To render opinion on the lifetime loss of
3  earning capacity for ████████ as a result of his
4  fall from a Southwest plane.
5    Q    Initially we were provided with a curriculum
6  vitae for you, which was given to us on February 19,
7  2015. And then since then, as we sit here today, you
8  provided me with an updated curriculum vitae which is
9  current as of today, correct?
10    A    It is.
11    Q    Okay. Just for the record the prior
12  curriculum vitae that was provided to us is in Group
13  Exhibit No. 1. The current vitae provided to me this
14  morning is Exhibit No. 5.
15    Just give us a brief rundown of where
16  you went to college?
17    A    Okay. My Bachelor's degree is from the
18  University of Illinois in Champaign-Urbana in
19  accounting. I have an M.B.A. from the University of
20  Chicago in finance, and I also have a Master's degree
21  in rehabilitation counseling from the University of
22  Kentucky.
23    Q    What does the Master's in Rehabilitation
24  Counseling allow you to do?

## Page 9

1    A    Rehabilitation counseling is a discipline
2  that works with persons with disabilities helping to
3  sort out the complexity disability might bring to their
4  life. Most commonly it has training in the medical and
5  psychosocial impacts of disability and the physical and
6  cognitive requirements of jobs in the U.S. labor
7  market.
8    Therefore, rehabilitation counselors
9  typically look at the interplay between the limitations
10  brought about by a disability and how they interfere or
11  interplay with the requirements in a labor market.
12  Therefore, giving opinions or helping the person with
13  the disabilities in terms of the likelihood of
14  employment.
15    Q    How long was that Master's program?
16    A    My program was about a year and a half. It's
17  typically a two-year program, but I was in an
18  accelerated program.
19    Q    Fair to say that your role as a
20  rehabilitation counselor is solely related to providing
21  expert legal opinions, correct?
22    A    Yes.
23    Q    And the latter that you were mentioning about
24  helping people gain employment and working with an



MAGNA
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

## Page 10

1    individual in order to figure out what they can do in
2    terms of employment following an injury, that's not
3    something that you do, correct?
4        A    You married two things in there.  The first
5    part is correct in that I don't get involved in helping
6    persons with disabilities find employment, but
7    obviously I do look at the types of employment they can
8    do or the limitations they have in employment.  So
9    you're half correct and half not.
10       Q    For the latter, helping people determine what
11   they can do based on their disability, how do you go
12   about doing that?
13       A    What I do is look at the limitations that a
14   person has, and I'm familiar with the -- through
15   training with the requirements of jobs in the U.S.
16   labor market.  Therefore, I am capable of having
17   opinions, rendering opinions, on how various cognitive
18   deficits or physical deficits may impact those jobs.
19           There's tools, such as the Dictionary of
20   Occupational Titles and others, that identify those
21   requirements for different jobs; and I have the
22   training and expertise to be able to say, yeah, most
23   likely they won't be able to do A, B, and C, but here's
24   the types of jobs they can do.

## Page 11

1            Further, through my research
2    publications I've done quite a bit of study and
3    research on the impact of disability of various forms
4    on the probability of somebody obtaining employment and
5    the impact it will have on their earnings when they are
6    employed.  So using various statistical sources I could
7    quantify the impact that the limitations a person has
8    will make on their lifetime works.
9        Q    And as you indicated, that's based on
10   statistics?
11       A    Yes.
12       Q    And probabilities?
13       A    Yes.
14       Q    Are you certified as a rehabilitation
15   counselor?
16       A    No longer.  I did attain that certification
17   as soon as I finished my Master's program, but I've let
18   that lapse; and it's really not required to do
19   anything, so it has no value.
20       Q    Is it even required to work with individuals
21   on a personal basis?
22       A    It depends.  I believe there's one or two
23   states that do require that for the rehabilitation
24   counselors they hire, but most of the state agencies do

## Page 12

1    not require it.
2        Q    And obviously it's not required for what you
3    do in rendering opinions for legal matters, correct?
4        A    That's right.
5        Q    And you have never worked as a clinical
6    vocational counselor, correct?
7        A    That's right.
8        Q    And you are a Certified Public Accountant,
9    right?
10       A    Yes.
11       Q    Have you ever practiced as a CPA?
12       A    No.
13       Q    Fair to say you do not have any background in
14   medicine?
15       A    I am in no way qualified as a medical expert.
16   I can't render opinions or give diagnoses.  My
17   rehabilitation counseling training does include limited
18   training and the medical impact of a disability.
19       Q    Fair to say the majority of times when you
20   take on cases, a person has been rendered disabled of
21   some sort, correct, as a result of an injury?
22       A    They have permanent limitations of some sort,
23   yes.
24       Q    And those permanent limitations were

## Page 13

1    diagnosed prior to you receiving the file, correct?
2        A    Yes.
3        Q    And in no way, shape, or form do you yourself
4    go and review a personal limitation or rediagnose it or
5    confirm it or anything of that nature?
6        A    That's correct.  I rely upon medical or
7    neuropsychological opinions on what the permanent
8    limitations are.
9        Q    You do not have any background in psychology,
10   correct?
11       A    Yes, but not as a psychological expert; but
12   because my degree is rehabilitation counseling, it
13   includes quite a bit of psychological study and
14   training; and I would be capable, if I were able to
15   pursue it, to be a counselor to some degree, not as a
16   licensed psychologist but a counselor.
17       Q    Okay.  What type of counselor?
18       A    Rehabilitation counseling is counseling in
19   itself.  Persons that do work with persons with
20   disabilities are giving them some counseling on a
21   psychological basis as well as an employment basis, but
22   that's nothing I've ever pursued.
23       Q    So even though you may have experience in
24   that respect from your schooling, you do not have any



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 14

1  experience in terms of work history?
2      A   That's right.
3      Q   And with respect to your psychological
4  training with your schooling, that does not include
5  diagnosing someone with cognitive disorders, correct?
6      A   That's right.
7      Q   And that does not include diagnosing someone
8  with cognitive limitations?
9      A   That's correct.
10     Q   We talked a little about how you have to rely
11  upon those medical and psychological diagnoses that you
12  receive when you get your file.  When there are
13  competing diagnoses in the file, how do you deal with
14  that in terms of writing your report?
15     A   I cannot claim to have the expertise to
16  referee between two people outside of my expertise.  So
17  I will generally render an opinion based upon the case
18  that the retaining attorney is putting forth and rely
19  upon the opposing attorneys to render opinions that
20  match their expert.
21     Q   So simply stated if there's competing
22  diagnoses, you follow the one that is represented by
23  the attorney that hired you, correct?
24     A   Yes.

Page 15

1      Q   And in this matter you did not diagnose
2  ██████ with a traumatic brain injury, correct?
3      A   That's correct.
4      Q   And you are relying upon the attorneys that
5  hired you in stating that ██████████ had a
6  traumatic brain injury?
7      A   Well, I was relying upon the expert that was
8  hired by that attorney and her opinions, Doctor
9  Ainsworth, on her opinions of limitations.
10     Q   Okay.  And I know Doctor Ainsworth did
11  diagnose ██████ as having a traumatic brain injury,
12  correct?
13     A   Yes.
14     Q   And she did diagnose ████ as having mild
15  intellectual disability, correct?
16     A   Yes.
17     Q   And she did diagnose ████ as having a mild
18  neurocognitive disorder, correct?
19     A   Yes.
20     Q   Can you tell me what limitations she actually
21  diagnosed ████ as having?
22     A   She talked about noting his pain, dizziness
23  and attentional difficulty, noting that he has to stand
24  every 20 minutes in school as a result of the pain.  So

Page 16

1  that's a note rather than her professional opinion
2  that's necessarily there.  She noted inadequate
3  receptive vocabulary for testing any of these, so she
4  didn't do these.
5          But as a result of her testing in
6  Spanish, she finds overall intellectual abilities are
7  in the impaired range, verbal, nonverbal, both; that he
8  has mildly impaired processing abilities.  He's
9  severely impaired on abstract tasks; moderately
10  impaired in block construction; poorly developed
11  processing speed; below average attention abilities;
12  impaired in math, reading comprehension and overall
13  academic abilities; that he has noted inattention and
14  mildly impaired executive functioning; then mildly
15  impaired to severely impaired memory; mild impairment
16  in visual discrimination; severely impaired in visual
17  working memory.
18          Her evaluation, was that based upon the
19  limitations he will always have difficulty with problem
20  solving.  He'll require supervision to manage his tasks
21  and make decisions; that he's at increased risk for
22  executive dysfunction and higher level problem solving;
23  that he will likely experience more difficulty as his
24  academic and social demands increase, as he ages; that

Page 17

1  he's at a risk for mood and affect disturbance; and
2  that pretty much covers it.
3      Q   Those are both observations, testing results
4  and then I'm assuming you read somewhere in there her
5  view of his limitations?
6      A   Yes.
7      Q   Now, how do you take that information and
8  determine what ████ can and can't do as an adult?
9      A   Obviously I'm not -- even without the
10  limitations I'm not at any stage saying that ████
11  would have done this specific job or that specific job.
12  For somebody as young as ████ he was only -- he was
13  less than five at the time -- no, he was seven years
14  old when I initially did the review.  He's eight years
15  old now.  Obviously what he will do in the future is a
16  long way off.
17          So the best way to measure what he will
18  likely do, what he will likely earn is based upon the
19  eventual education that he'll attain that has the
20  highest correlation to expected earnings.  So I looked
21  at his likely earnings and employment based upon three
22  different levels of education, attaining a high school
23  diploma, going on and getting some college but not
24  finishing a degree and getting an Associate degree.



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 18

1　And for all three of those levels I look at the impact
2　of going from a person with no disability to a person
3　with cognitive limitations, with nonsevere limitations,
4　at least in my initial report; and then I think as
5　we'll talk about adjusting that to include physical
6　limitations as another analysis in my updated report.
7　　Q　So from what I understand, just to make it
8　more simpler, first you have to determine what
9　education he would have attained preinjury, correct?
10　　A　Yes.
11　　Q　And then you're going to look, if he had
12　obtained that education post-injury, how his nonsevere
13　cognitive limitations would affect that earning?
14　　A　Correct.
15　　Q　And the data that you rely upon to show the
16　decrease in earnings for nonsevere cognitive
17　limitations, where does that come from?
18　　A　It comes from the American Community Survey,
19　which is a survey conducted by the U.S. Census Bureau.
20　　Q　And roughly -- is that a survey of the whole
21　United States?
22　　A　It is. They sample about 1 percent of the
23　U.S. population per year, so that's more than 3 million
24　people.

Page 19

1　　Q　And they sample those people and ask them --
2　or somehow they determine whether or not they have a
3　regular cognition or a nonsevere cognitive limitation?
4　　A　There's a question within the ACS, American
5　Community Survey, that asks -- a person that has a
6　cognitive limitation that's asked by identifying
7　whether the person because of a physical, mental or
8　emotional condition, does this person have serious
9　difficulty concentrating, remembering or making
10　decisions.
11　　Q　And then they're able to take the income from
12　that person and compare it to someone that doesn't have
13　a cognitive limitation?
14　　A　There are just a ton of questions that are
15　asked in the survey, you could essentially cross
16　tabulate the responses with any questions with any
17　other question. So what I do is cross-tabulate the
18　identification of the cognitive limitation with how
19　much the person earns and what their education is and
20　what their gender is. I also cross-tabulate it with
21　whether or not they're employed which renders the
22　probability of employment.
23　　Q　Which American survey did you rely upon for
24　████████?

Page 20

1　　A　My original report from July of 2014 used
2　data from the 2008 through 2012 survey. My updated
3　report used more modern data, updated I think at one
4　year -- yes, the 2009 through 2013 survey, in terms of
5　the cognitive disabilities.
6　　Q　That would have been the most current one
7　that you could use, correct?
8　　A　Yes.
9　　Q　Fair to say for ████████ diagnosis of neck,
10　upper back, left foot pain and his bilateral eye issues
11　you relied upon the medical expert, Doctor Glaser,
12　correct?
13　　A　I'm sorry. Did you say Doctor Glaser?
14　　Q　Yes.
15　　A　Yes, I did.
16　　Q　Specifically I guess Doctor Glaser had
17　diagnosed him with a neck, upper back and left foot
18　pain?
19　　A　With a few different areas, chronic daily
20　headaches, neck pain and upper back pain, yes, with
21　limitations in vision, concentration, learning
22　disability, that he has to lie down frequently, things
23　on those lines.
24　　Q　So Doctor Glaser was the neck and upper back

Page 21

1　and the headaches?
2　　A　Yes.
3　　Q　Where did you come to the conclusion that
4　████████ had continual left foot pain?
5　　A　I'm sorry. Where are you looking at right
6　now?
7　　Q　Page 3 of your --
8　　A　That was noted in some of the early medical
9　records, but it was also confirmed in my interview with
10　████████ mother, Maria, that that was continuing at the
11　time of my interview.
12　　Q　Okay. If you look on page 2 of your report
13　there's Reported Problems?
14　　A　I'm sorry. When you say "report," which
15　report are you looking at.
16　　Q　Right now I'm going to use the July 14, 2015
17　report because it's the more current one.
18　　A　Okay.
19　　Q　If you look at page 2 of your report it says
20　Reported Problems. I don't see anything specific there
21　as to left foot.
22　　A　That's right.
23　　Q　So if she had told you that ████ was
24　continuing to complain of left foot pain, where would



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.



Page 22

1 that be noted?
2   A   It wouldn't be noted in terms of my overall
3 evaluation of his limitations.  I just -- that's
4 something that was reported during the interview that I
5 made note of, but it's not part of my evaluation of
6 what his loss of earnings is.
7   Q   Okay.  So in terms of his physical -- strike
8 that.  I'll go back.
9       You actually diagnosed ▇▇▇ as having
10 decreased vocational ability on the cognitive level,
11 correct, and we just discussed that?
12   A   I'm sorry.  Say that over again.
13   Q   You had opined that ▇▇▇ had decreased
14 vocational abilities based on his cognitive
15 limitations, correct?
16   A   I did in the original report, and I carried
17 that over, mirrored that, in the updated report; but I
18 also indicate that combined with the physical
19 limitations discussed by Doctor Glaser, that those
20 limitations or that decrease in his abilities is even
21 more profound.
22   Q   So what physical limitations did you take
23 into account in determining that decreased vocational
24 ability?

Page 23

1   A   The overall pain identified by Doctor Glaser
2 is going to impact his physical functioning and also
3 his cognitive functioning as a result of the opiates
4 that Doctor Glaser is identifying that he'll eventually
5 need; but overall the neck pain, the head pain would
6 result in decreased abilities in terms of reaching,
7 lifting, carrying, which would be under the definition
8 of a physical disability.
9   Q   So you didn't take into account left foot
10 pain or bilateral eye issues in determining his
11 physical limitations?
12   A   I did not.
13   Q   And fair to say that the physical limitations
14 that you took into account were all diagnosed by Doctor
15 Glaser?
16   A   Diagnosed I would say that's true.  They were
17 noted by other doctors but in terms of the diagnosis
18 that would be accurate.
19   Q   Would you agree with me -- strike that.
20       Have you seen any updated records and
21 specifically records from May of 2015 that note that
22 ▇▇▇ is no longer taking medications for pain and that
23 ▇▇▇ is no longer complaining about any type of pain
24 on a regular basis?

Page 24

1   A   I don't believe I have.  Let's see.  I did
2 receive some updated records from University of
3 Illinois Medical Center -- I'm not sure the date of
4 those records -- and also some updated records from
5 Illinois Eye Institute, but potentially within the
6 Illinois Medical Center there may be some discussion.
7   Q   You don't know as you sit here today?
8   A   That's right.
9   Q   And do you know as you sit here today whether
10 or not any other doctor besides Doctor Glaser had
11 diagnosed ▇▇▇ with chronic pain?
12   A   Doctor Vogel within his life care plan.
13   Q   Fair to say Doctor Vogel relied upon Doctor
14 Glaser's report as well?
15   A   Well, Doctor Vogel is a medical doctor
16 himself, and he did physically examine ▇▇▇
17   Q   You're not aware of the extent of that
18 physical examination, correct -- strike that.
19       Are you aware that Doctor Vogel's
20 physical examination of ▇▇▇ was normal?
21   A   No, I'm not.
22   Q   Okay.  So you don't know whether or not
23 Doctor Vogel relied on his physical exam that he did
24 personally or whether or not he was relying upon Doctor

Page 25

1 Glaser's records?
2   A   I don't.
3   Q   Other than Doctor Vogel do you know any other
4 doctors in this matter that have treated ▇▇▇ that
5 have diagnosed ▇▇▇ with chronic pain?
6   A   I do not.
7   Q   How many of your cases that you do on a
8 yearly basis deal with children?
9   A   Quite a few.  I would say 20 to 30 percent.
10   Q   And also we talked about your testifying
11 history in terms of depositions and trials, but there's
12 also a large number of cases that you get that don't
13 make it on your list because you don't testify,
14 correct?
15   A   That's correct.
16   Q   You might make an opinion or review some
17 records, but eventually it doesn't lead to any
18 testimony?
19   A   Correct.
20   Q   So the 20 to 30 percent of cases that you
21 review, that's including everything, not just cases you
22 testify for, correct?
23   A   That's right.
24   Q   And I don't know if you can break it down,

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 26

1 but how many of those 20 to 30 percent of cases that
2 you have with children deal with children that are like
3 under the age of 10?
4    A   I would say probably the majority of those in
5 that I see a lot of birth trauma cases, brachial plexus
6 injuries, things of that nature; and so usually I would
7 say the most common cause of the limitations that I see
8 in the child cases would be birth trauma.
9    Q   How many of the cases that you receive on a
10 yearly basis are for the plaintiff rather than the
11 defense?
12    A   Approximately 70 percent plaintiff.
13    Q   The majority of cases that you actually
14 testify in are those mostly the plaintiff?
15    A   Yes, and that's a higher percentage
16 obviously.  Most of the defense cases I get involved in
17 I don't testify.  So it's probably more like 95 percent
18 plaintiff.
19    Q   As you sit here today, could you calculate
20 how many cases you have that are for the defense?
21    A   What do you mean; that are active?
22    Q   Yes, active cases.
23    A   I don't know.  Attorneys know whether a case
24 is active or not.  We often don't.  Once we issue a

Page 27

1 report, we never hear about the case again.  So I can't
2 tell you which cases are closed, which ones are open.
3 Best I could tell you is that on average I analyze 120
4 new cases per year, and that's the best indicator of
5 volume I could give you.
6    Q   And you don't know out of those 120 new cases
7 a year are for plaintiff versus defendant?
8    A   Yeah, and my opinion of 30 percent/70 percent
9 would carry.
10    Q   I want to go through -- these are for you.
11 These are the exhibits I marked today.
12       So I want to go through a little bit in
13 more detail the differences between your reports.  The
14 first report I have that you prepared in this matter
15 which I have identified as Exhibit No. 2 is from July
16 8, 2014, correct?
17    A   It is.
18    Q   And in this report you actually addressed it
19 to Mr. Dennis Kellogg because he's the one who retained
20 you, correct?
21    A   He was.
22    Q   And this report is a Vocational Economic
23 Assessment for ███████, correct?
24    A   It is.

Page 28

1    Q   You produced to us a fee schedule that you
2 had; and if you'll look at the very back of Exhibit 1,
3 the last two pages there's a fee agreement, and then a
4 fee schedule is the very last page, correct?
5    A   Yes.
6    Q   It looks like your Vocational Economic
7 Assessment you charge at a flat rate of 4,500, correct?
8    A   Correct.
9    Q   I'm assuming that you charged Mr. Dennis
10 Kellogg 4,500 for your July 8, 2014 Vocational Economic
11 Assessment, correct?
12    A   I believe that's correct, but let me just
13 verify that.
14       It is.
15    Q   Where did you confirm that?
16    A   Oh, I'm looking in my Gibson file review
17 notes on page 6 of 8, and there under the admin section
18 you'll see the first one is ICF, which stands for
19 Informed Consent Form, and fee agreement, noting that
20 on the right-hand side that was $4,500 and then the
21 hourly rates.
22    Q   So on February 18, 2014 you entered into a
23 retainer with Mr. Kellogg?
24    A   Yes.

Page 29

1    Q   Why does it say on July 6, 2015 you had a
2 signed fee agreement?
3    A   That is the second fee agreement that dealt
4 with the economics of the life care plan.
5    Q   Because that is a separate flat fee, correct?
6    A   Yes.
7    Q   I don't see any indication as to what you
8 charged for your second set of reports.  So let's get
9 into that for a second.
10    A   In terms of the updated analysis or updated
11 Vocational Economic Assessment that would have been
12 billed at an hourly rate and consistent with what's
13 shown there of $450 per hour.  I'm not sure how much
14 time we put into it but probably one to two hours at
15 450.
16       And then in terms of the life care plan,
17 the economics and the life care plan, that was billed
18 at a flat fee, and the fee agreement for that was
19 $2,800.
20    Q   So that's your flat fee for preparing that
21 report; and then if you do any more work on that, you
22 would charge the hourly rate?
23    A   Yes.
24    Q   So based on your notes here on page 6, it


MAGNA
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 30

1  seems to me that on July 6, 2015, that day or a few
2  days before you said, correct, that is when you were
3  first asked to prepare your estimate for the life care
4  plan?
5      A   Yes.
6      Q   Do you know as you sit here today why you
7  were asked to prepare an updated Vocational Economic
8  Assessment?
9      A   I learned that the Rapoport Law Office had
10 recently become a participant in the case, I guess
11 would be the word, and Mr. Weisberg called me and said
12 he had some updated medical information that he didn't
13 think I had seen yet, which was true.  He was sending
14 that and asked me that if it had any impact on my
15 opinion, go ahead and update my report.
16     Q   So from the time that you prepared your
17 initial report, July 18, 2014, until the time that you
18 spoke to Mr. Weisberg on -- almost a year later, July
19 6, 2015, you didn't receive any updated records at all,
20 correct?
21     A   That's right.
22     Q   Did you receive any communication from Dennis
23 Kellogg or any other attorney in this matter that you
24 can think of?

Page 31

1      A   The only updated information I've received in
2  the case since my initial report were the updated
3  medical records I mentioned earlier from University of
4  Illinois and the Illinois Eye Institute, the
5  depositions of Ms. Mejia, M-e-j-i-a, and Ms. Martinez,
6  and the reports of Doctors Glaser and Hunter and the
7  updated life care plan from Doctor Vogel.  All those
8  would have come in from Mr. Weisberg's office.
9      Q   I got it.  Okay.  Initially when you first
10 were retained, I'm assuming your bills were going out
11 to Dennis Kellogg?
12     A   Yes.
13     Q   Who are the bills going out to as of today?
14     A   Mr. Weisberg.
15     Q   But you don't consider that a change of
16 clients?
17     A   I guess it could be.  I mean, the client is
18 our attorney, but I just considered it a change in who
19 is coordinating the case.  It's the same case.
20     Q   What was your view as to why you were asked
21 to prepare the life care plan?
22     A   Mr. Weisberg felt it was -- he would like to
23 have an economic opinion on the life care plan, and
24 there was none for the original plan.

Page 32

1      Q   Were you aware that Doctor Vogel had
2  actually -- strike that.
3          Do you know when Doctor Vogel actually
4  had prepared this life care plan?
5      A   The original plan that we had at the time of
6  our original report was from February 6, 2014.  His
7  updated plan looks like it's dated October 7, 2014.
8      Q   Fair to say that Doctor Vogel's report did
9  exist at the time that you prepared your first report
10 on July 8, 2014, correct?
11     A   His first report, yes.  Yes.
12     Q   And also fair to say that you did not have
13 that in your possession when you prepared your July 8,
14 2014 report, correct?
15     A   I did have the first report in my possession.
16 So his February 6th report I had, but I was not asked
17 to do an economic evaluation of that.
18     Q   Okay.  I got it.  You compare the items that
19 you had -- strike that.
20          First I've got to say the information
21 that you reviewed, there's a section for that on page 2
22 of both of your reports?
23     A   Yes.
24     Q   Is that all the information that you received

Page 33

1  because I know there's a distinction.  I just want to
2  make sure you didn't receive anything, not that you
3  didn't review?
4      A   Oh, I understand.  Yes, I list all the
5  substantive information that I've received and
6  reviewed.  The only thing that would not be included in
7  there would be administrative documents.  So the fee
8  agreement isn't listed there.  So that's what I would
9  consider administrative.  But anything that's
10 nonadministrative I would list there.
11     Q   So I'm comparing the information from your
12 July 8, 2014 report to your July 14, 2015 report in
13 terms of the information that you reviewed.  And it
14 looks like the new information that you received for
15 your second report is listed at the very bottom of that
16 list, correct?
17     A   I'm not sure.  I had my case manager fill
18 that out, and I didn't check to see if she changed the
19 ordering at all.
20     Q   We can go through it really quick.  So the
21 information reviewed, hospitalization case report from
22 Chicago police, that's the same on both reports,
23 correct?
24     A   Yes, it would be.



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 34

1    Q    Records from Edna Rollins Elementary School,
2 that's the same on both reports?
3    A    Yes.
4    Q    Life care plan prepared by Rehabilitation
5 Consultants, LLC, that's the same on both reports,
6 correct?
7    A    Yes.
8    Q    The neuropsychological evaluation by Courtney
9 Rourke Ainsworth, that's the same on both reports,
10 correct?
11    A    It would be.
12    Q    Medical records from Advocate Christ Medical
13 Center, that's the same, correct?
14    A    Yes.
15    Q    Medical records from Copley Memorial
16 Hospital, that's the same?
17    A    Yes.
18    Q    Medical records and bills from Grandview
19 Health Partners, that's the same on both reports,
20 correct?
21    A    It is.
22    Q    Medical records from the Illinois Bone &
23 Joint Institute, that's the same on both reports,
24 correct?

Page 35

1    A    Yes.
2    Q    Medical records and bills from Rush-Copley
3 Medical Center, that's the same on both reports,
4 correct?
5    A    It is.
6    Q    Medical records from University of Illinois
7 Medical Center, that's the same on both reports,
8 correct?
9    A    Yes.
10    Q    And medical records and bills from VNA Health
11 Center, that's the same on both reports, correct?
12    A    It is.
13    Q    So everything on your July 14, 2015 report
14 that's listed underneath here, we can assume that you
15 did not have in your possession as of the time of your
16 first report, correct?
17    A    Yes.  They appear to be consistent with what
18 I mentioned before were updated information.
19    Q    So the updated information for your second
20 report, from what I can opine, is a medical opinion
21 from Scott Glaser, M.D., correct?
22    A    Yes.
23    Q    And that is dated 9-2 of '14.  I'm assuming
24 that date means that's when he prepared it, correct?

Page 36

1    A    Yes, it is.
2    Q    The second one, neuropsychological evaluation
3 of Doctor Scott Hunter, Ph.D., do you see that one?
4    A    I do.
5    Q    That's from January 2, 2015, correct?
6    A    Correct.
7    Q    Again, that's when he prepared that report?
8    A    Yes.  Actually I think that's the date he met
9 with ███████  His report was dated January 5th, but
10 close enough.
11    Q    I got it, okay.  The next one is medical
12 records of the Illinois Eye Institute.  Do you have any
13 idea as to what date those medical records were for?
14    A    They were multiple dates.  Usually medical
15 records cover a span of time, so I don't recall what
16 the dates were.
17    Q    Fair to say, do you know if those medical
18 records predated April 2015?
19    A    I don't.  I mean, I could look at them, but I
20 don't know off the top of my head.
21    Q    Does your sheet say, or no?
22    A    No, it will not.
23    Q    And you actually don't have those medical
24 records?

Page 37

1    A    I do.
2    Q    Oh, you do.  I won't have you look at them
3 right now.
4         The deposition of Christine Martinez,
5 that's something that you received.  Are you aware that
6 her deposition took place on January 12, 2015?
7    A    I am.
8    Q    Deposition of Norma Mejia, again, you
9 received that information.  Are you aware that her
10 deposition took place on January 12, 2015?
11    A    I am.
12    Q    Medical records from University of Illinois
13 Medical Center, any idea the dates of those revised --
14 or strike that.
15         You already had medical records from the
16 University of Illinois.  I'm assuming you received
17 updated medical records, correct?
18    A    That's correct.
19    Q    And any idea when those medical records were
20 created or prepared?
21    A    Not without looking at them.
22    Q    And the last one on that list is updated life
23 care plan from the Pediatric Rehabilitation
24 Consultants, LLC, and that date is October 7, 2014,



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 38

1    correct?
2        A    It is.
3        Q    As you sit here today, are you aware of any
4    records that may have predated April 2, 2015 that you
5    received?
6        A    Predated or postdated?
7        Q    Postdated.
8        A    Not that I'm aware of.
9        Q    Do you know how many cases you've worked on
10   with Dennis Kellogg?
11       A    I'm not sure if there were others.  There may
12   have been one or two others at the most but not very
13   many.
14       Q    Do you know how many cases you've had with
15   the Rapaport Law Office?
16       A    Several more than that.  I probably currently
17   evaluate maybe anywhere from three to five cases for
18   them on an annual bases.
19       Q    Not all of those cases resolved?
20       A    Not all -- oh, yes, that's correct.
21       Q    And the Rapaport Law Office does primarily
22   plaintiff work, correct?
23       A    To my knowledge, yes.
24       Q    So what was your understanding as to why

Page 39

1    additional opinions were asked of you?
2        A    First of all, there was no previous opinion
3    on the present cash value of the life care plan;
4    secondly, when Mr. Weisberg took over the case, he
5    noted that there was updated medical information that
6    didn't look like I had received at the time of my
7    original report, and he wanted me to consider those.
8        Q    So it's your understanding there's a change
9    in regime of attorneys in this matter, and they looked
10   over the file and asked you to do some additional
11   things, correct?
12       A    Yes.
13       Q    You don't have any idea when they first came
14   on board in the case, do you?
15       A    I don't.
16       Q    Now, your first report in 2014 just took into
17   account the limitations and the cognitive disability?
18       A    That's correct.
19       Q    And then your second report, that was in
20   2015, at least in terms of your Vocational Economic
21   Assessment, took into account limitations as to
22   cognitive and physical limitations, correct?
23       A    Correct.
24       Q    Was that something that you had decided to do

Page 40

1    based on the additional records you reviewed, or was
2    that something that was asked of you?
3        A    I was asked to consider the reports
4    specifically of Doctor Glaser to see if that changed
5    the caveat I had put in my original report where I
6    noted I didn't have any medical opinions concerning the
7    physical side at that time; and so Doctor -- or Mr.
8    Weisberg asked me to consider that to see if that would
9    change my opinion and, if so, to issue a new report.
10       Q    And, in fact, you determined that that had
11   changed your opinion, and that's why you corrected your
12   report, correct?
13       A    It is.
14       Q    Would you agree with me that it's more
15   difficult to provide a Vocational Economic Assessment
16   for a child as opposed to an adult?
17       A    Yes and no.  I mean, in terms of the overall
18   effort, the work that's put into it, it's probably
19   easier for a child because it's not as complex.  You
20   base it upon education as the strongest predictor.  But
21   in terms of having more certainty as far as the career
22   path is going to be, definitely.  There's no way of
23   saying with certainty either preinjury or post-injury
24   for a child who is only eight years old what career

Page 41

1    path they're going.  I rely upon reasonable scientific
2    certainty based upon their educational level.  If I had
3    an adult who was a 40-year-old pipefitter, then I'd
4    obviously know what his preinjury career path was.
5        Q    With adults you're generally given a baseline
6    of their educational level as well as income, correct?
7        A    Yes.
8        Q    And with a child you don't have that luxury,
9    correct?
10       A    Yes.
11       Q    And with the child in particular you have to
12   speculate as to how far they would have gone in school
13   but for a disability?
14       A    I wouldn't use the word speculate.  I use --
15   I would say with reasonable scientific certainty I give
16   losses based upon varying levels of education.  I leave
17   it to the trier of fact to determine which of the
18   proxies I offer is best suited, but I will adjust the
19   proxies I offer based upon the educational history of
20   the parents, where with [REDACTED] I give a lower range of
21   educational attainment than I would if I had a child of
22   two professionals.
23       Q    And you would agree with me you would
24   describe it as -- you don't like the word speculate.  I

MAGNA ▶
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 42

1  understand that. But you're projecting through
2  statistics as to how far they would actually go in
3  school, correct?
4      A  Yes.
5      Q  And the children, you would have to project
6  through statistics as to what type of employment they
7  would have held but for a disability, correct?
8      A  Yes.
9      Q  And with children you have to project through
10  statistics what type of salary they would have been
11  making but for a disability, correct?
12      A  Yes.
13      Q  And, again, with an adult where you're just
14  projecting the post-injury status of an individual;
15  with a child you have to project the preinjury as well
16  as the post-injury status, correct?
17      A  Generally correct. I mean, quite often
18  adults may not be a matured, seasoned adult. They
19  could be a young adult who is still on the upper
20  trajectory of their career, and you need to make some
21  projections on that side.
22      Q  Most definitely with a seven-year-old kid you
23  have to project both a preinjury and post-injury status
24  of that person?

Page 43

1      A  That's correct.
2      Q  And in terms of ▓▓▓ you had to make an
3  assumption as to what type of educational level he
4  would have obtained preinjury, correct?
5      A  Yes.
6      Q  And you actually have no idea what ▓▓▓
7  would have done in terms of employment as an adult had
8  the accident not happened?
9      A  I have no specific opinion and am incapable
10  of rendering a specific opinion that he would have done
11  this job from this point to this job at this point to
12  this job at this point. That would be folly. But I do
13  have opinions how much he would earn and the types of
14  employment that he would have based upon varying levels
15  of education.
16      Q  Actually, you went and you met with ▓▓▓
17  family?
18      A  I had a telephonic interview with his mother,
19  Maria.
20      Q  In your telephonic interview looks like from
21  your report that you found out that ▓▓▓ mother
22  obtained a middle school education, correct?
23      A  That's correct.
24      Q  And that his father obtained a ninth grade

Page 44

1  education, correct?
2      A  That's correct.
3      Q  Did you ask questions as to anyone else in
4  ▓▓▓ family about their educational level?
5      A  I noted that he had an older sister who had a
6  high school degree, and he had a twin brother who was
7  also -- who had also just finished kindergarten at the
8  time of the interview but was rolling along without
9  limitations.
10      Q  The older sister that you mentioned, was that
11  Nancy Gonzalez?
12      A  I didn't record a name. That's what I
13  asked -- I asked the mother who else is in the home,
14  and she noted that his twin brother and her older
15  sister, and she didn't give a name.
16      Q  Did you note that in Doctor Vogel's report he
17  had a detailed history of members in ▓▓▓ family and
18  their educational attainment?
19      A  I did note that.
20      Q  So based on those notes in there and what we
21  have learned since deposing individuals in this matter
22  I'm showing that his older sister, Nancy Gonzalez, she
23  went through the tenth grade and she -- this was
24  recently. I mean, she's in her 20s. So she did not

Page 45

1  complete high school, were you aware of that?
2      A  No.
3      Q  And that's someone that actually lived with
4  ▓▓▓ in the home. He had a half brother in Texas that
5  actually has a high school diploma. Were you aware of
6  that?
7      A  Only from Doctor -- forgive me. I --
8      Q  Vogel?
9      A  Vogel's report, yes.
10      Q  And then Doctor Vogel also noted that ▓▓▓
11  had two half siblings in Texas that had no high school
12  degrees. Do you remember that?
13      A  I recall him discussing it.
14      Q  And then ▓▓▓ had a half sister who had an
15  eleventh grade education. That's what Doctor Vogel
16  said too, you recall that?
17      A  Yes.
18      Q  And then Doctor Vogel actually asked about
19  uncles, and he was given information about four of
20  ▓▓▓ paternal uncles and noted that out of those
21  four uncles three had no high school diplomas and one
22  had a high school diploma. Is that something you
23  vaguely remember?
24      A  I remember the discussion. Again, I don't



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.



Page 46

1  remember what levels.
2      Q   Okay.  So out of the ten people that we have
3  information about in ▮▮▮ family that are of the age
4  that they could have graduated high school, only two of
5  those ten people had actually graduated high school.
6  Are you aware of that?
7      A   I am not.  I mean, I'm sure that's in there.
8  I don't dispute it.
9      Q   Are you aware whether or not anyone in
10 ▮▮▮ family ever attended any type of college?
11     A   I'm not.
12     Q   Fair to say you'd agree with me that there's
13 no evidence in this case that any member of his family
14 ever took one course in college?
15     A   I am not aware of any information.
16     Q   Why is it that you made the assumption that
17 ▮▮▮ would have graduated high school?
18     A   Because, as noted in my report, of persons
19 born in the United States that do not have cognitive
20 limitations that are between the ages of 25 and 34, 92
21 percent of them have completed a high school education.
22     Q   Are you aware that ▮▮▮ goes to the East
23 Aurora School, that he's -- strike that.
24           Are you aware that ▮▮▮ is enrolled in

Page 47

1  the East Aurora High School School District?
2      A   I'm not sure about the high school, but I'm
3  aware that he's in East Aurora for his elementary
4  schools.
5      Q   Were you aware that the state of Illinois
6  only has an 88 percent high school graduation rate?
7      A   That may be, but it's not segregating it to
8  the native-born persons with no cognitive limitations.
9      Q   Are you aware that East Aurora School
10 District has a 59 percent graduation rate?
11     A   Again, that may be, but it's not segregated
12 to the specific population that I'd look at.
13     Q   Wouldn't you agree that ▮▮▮ is more a
14 candidate to the population where he currently resides
15 than the whole United States population?
16     A   Not necessarily, no.
17     Q   Why is that?
18     A   Because you're looking at a population that
19 is broader than what I'm looking at.  By looking at
20 everybody that goes to East Aurora and not segregating
21 it into the groups that I have, then you're using a
22 broader measure than I am.
23     Q   But you actually didn't consult any surveys
24 regarding the educational attainment of individuals

Page 48

1  where English is a second language, correct?
2      A   That's correct.
3      Q   That fits ▮▮▮ correct?
4      A   It does.
5      Q   Did you consult any surveys regarding the
6  educational attainment of Hispanic males?
7      A   No.
8      Q   And that actually fits ▮▮▮ correct?
9      A   It does.
10     Q   Have you consulted any surveys or any
11 information about Hispanic males growing up without
12 married parents and their educational attainment?
13     A   No.
14     Q   That fits ▮▮▮ correct?
15     A   It does.
16     Q   Anything in your study about the educational
17 attainment as it relates to a socioeconomic status?
18     A   No.
19     Q   But isn't it fair to say that all of those
20 things are specific to ▮▮▮, and you didn't
21 take any of those into account?
22     A   I think it would be improper, that is
23 correct.
24     Q   Improper to take those things into account?

Page 49

1      A   That's correct.
2      Q   So you would not agree that the statistics
3  and probabilities in ▮▮▮ own family are a better
4  indicator of what ▮▮▮ is going to do with education
5  than the general population in the United States?
6      A   No, I wouldn't.  When you're looking at at
7  least the two adults that we know of that were educated
8  in Mexico as opposed to the United States, they're not
9  the native-born population that I think is specific to
10 what we're looking at.  I don't know about the uncles
11 that you refer to; but most likely if they are uncles,
12 they would also have some limitation in that form.
13     Q   Have you ever done any studies or looked at
14 any data that shows the educational attainment of
15 parents has a direct reflection on the educational
16 attainment of the children?
17     A   Yes, which is why I hold the education levels
18 down to the level that I noted earlier.
19     Q   Is there a reason that you did not hold
20 ▮▮▮ educational level down to a nonhigh school
21 diploma?
22     A   Yes, for the specific reasons that I gave;
23 that 92 percent of all of native-born Americans will
24 finish high school and that the education level of each

MAGNA
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.



**Page 50**

1  successive generation grows a little bit higher than
2  the previous one.
3      Q   You already indicated earlier, you testified
4  that your job is to provide information to the trier of
5  fact so they can make an assessment as to what ▒▒▒▒▒
6  preinjury and post-injury attainment would be, correct?
7      A   Yes.
8      Q   And I'm assuming that you would say that your
9  objective is for a fair assessment as to what his wage
10 loss could be --
11     A   Yes.
12     Q   -- both on the high end and the low end,
13 correct?
14     A   Yes.
15     Q   So is it disingenuous that you did not
16 calculate what ▒▒▒▒▒ wage loss would have been
17 without a high school education?
18     A   No, for the reasons I've already given.
19     Q   But it's very probable that ▒▒▒▒▒ may not
20 graduate high school preinjury, correct?
21     A   "Very probable," what science is that?
22     Q   There's a possibility that ▒▒▒▒ may not have
23 graduated high school preinjury, correct?
24     A   There's a possibility he could become a

**Page 51**

1  neurosurgeon too.  I'm not evaluating possibilities.
2  I'm evaluating likelihoods.  The likelihood is that all
3  native-born Americans are extremely likely to finish at
4  least a high school diploma.
5      Q   But the likelihood is that in ▒▒▒▒▒ family
6  very few people actually graduate high school, correct?
7      A   Yes.  And there, again, you're selecting a
8  population that doesn't necessarily match what I'm
9  looking at with ▒▒▒▒▒
10     Q   You don't agree that families instill values
11 on their kids and teach them the importance of
12 schooling, and they have a direct impact on whether or
13 not their kid graduates high school?
14     A   I do agree with that.
15     Q   Okay.  Why didn't you take that into
16 consideration when deciding whether or not ▒▒▒▒▒ would
17 have a preinjury high school education?
18     A   I did take that into consideration.  As I
19 testified to twice already, I'll say it a third time.
20 I've limited the education levels I'm exploring with
21 ▒▒▒▒▒ due to the fact that he has a low education
22 family.
23     Q   A low education family means no high school,
24 correct?

**Page 52**

1      A   It does not.  Asked and answered.
2      Q   That's a reality though?
3      A   And that's asked and answered.
4      Q   So you wouldn't agree that you're not
5  providing a jury with a complete picture of what
6  ▒▒▒▒▒ complete wage loss could be, correct?
7      A   Yes.  I don't include medical degree in
8  there.  I don't say he's going to become a nuclear
9  physicist.  I also don't say he's going to drop out of
10 elementary school.
11     Q   Fair to say that if you had calculated what
12 ▒▒▒▒▒ wage loss would have been if he had not
13 graduated high school, it would have been lower than
14 what you calculated, correct?
15     A   It would.
16     Q   You can't opine as to how much lower,
17 correct?
18     A   I could.
19     Q   You can?
20     A   Yes.
21     Q   As you sit here today though?
22     A   Yes.
23     Q   Okay.  What would that be?
24     A   It would be approximately 10 percent less.

**Page 53**

1      Q   How do you know that?
2      A   I've done a number of cases where I've looked
3  at persons with less than a high school degree.
4      Q   And what information would you consult to
5  make that determines?
6      A   The same source that I used here, the
7  American Community Survey.
8      Q   When you provide economic vocational
9  assessments for adults, don't you generally give them
10 tests to determine overall academic levels and their
11 propensity for certain careers?
12     A   Not necessarily.  I mean if it's somebody who
13 has already attained a high level of education, it's
14 folly to give them any testing.  If it's somebody that
15 has low educational attainment and is knocked out of
16 the manual labor force they previously worked in, then,
17 yes, I may do that.
18     Q   Such as the Wide Range Achievement Test and
19 the Career Assessment Inventory?
20     A   Yes.
21     Q   Okay.  You did not conduct any tests with
22 ▒▒▒▒▒ correct?
23     A   The neuropsychologist provides much more
24 thorough testing than I could ever attempt to render.



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 54

1    I relied upon Doctor Ainsworth's extensive testing.
2        Q   And it's true that if the functional
3    limitations of ▮▮▮▮▮▮▮▮ were not accurately
4    diagnosed by Doctor Ainsworth your assessment and
5    figures would not be accurate, correct?
6        A   Potentially correct.
7        Q   How is that potentially?
8        A   I need to know how Doctor Ainsworth's
9    opinions were inaccurate.
10       Q   If, in fact, ▮▮▮▮ did not have the
11   limitations -- any of the limitations that Doctor
12   Ainsworth had diagnosed, your report would not be
13   accurate, correct?
14       A   That would be correct.
15       Q   If the functional physical limitations of
16   ▮▮▮▮▮▮▮▮ were not accurately diagnosed by Doctor
17   Glaser, who was the pain specialist, your figures and
18   assessments would not be accurate, correct?
19       A   That would be correct.
20       Q   If you'd look at page 5 of your report.  I'm
21   just going to look at your most recent report, which is
22   the July 2015 report.  You have the lifetime earning
23   capacity.  Again, you showed high school, some college
24   and then Associate's degree.  Do you have off the top

Page 55

1    of your head what a preinjury and post-injury earning
2    capacity would be for a no high school education?
3        A   Off the top of my head I would say it's
4    probably going to be about 32 to 35,000 without a
5    disability and about 25, 28,000 with.
6        Q   And these are yearly salaries, correct?
7        A   Average annuals, yes.
8        Q   Average annuals.  So based on the earning
9    capacities that you provided, how do you determine the
10   actual loss of earning capacity, which is the table
11   that you have on page 6?
12       A   I combine the amount he would earn with the
13   likelihood that he would be employed each year.  The
14   likelihood of employment will vary depending on his
15   disability status, where he's more likely to be
16   employed with no disability than he is with a cognitive
17   only disability than he is with a cognitive disability
18   combined with physical disability.  So each of those is
19   successfully less.
20           As a result of that, the work life
21   expectancies which are shown on table 2 are
22   successfully less.  So when you extend the earnings
23   that are identified in table 1 over the work life
24   expectancies identified in table 2, I derive lifetime

Page 56

1    earnings and present cash value that I can compare on
2    the preinjury side to the two different post-injury
3    sides to arrive at the present cash value of the losses
4    on table 3; but the exact computations, which I'd be
5    happy to go through, are detailed in the pages that
6    start on 42.
7        Q   These do not assume that he's going to be
8    employed every single year?
9        A   That's right.  It's assuming that even
10   without a disability, that there's a limited likelihood
11   of -- that he would be out of the work force at any
12   given point in time.  So, for example, at the age of 18
13   with a high school diploma and no disability I'm
14   showing that the total years he would work would be
15   36.8.  That doesn't mean I would see him working to the
16   age of 54 and then retiring.  It means by the time I
17   adjust for gaps in employment, that he would likely
18   have due to illness, taking time off for a family or
19   whatever else, that the total number of years he would
20   work before he was to retire would be 36.8.
21       Q   Okay.  And those figures come from that
22   American survey?
23       A   Combination.  The American Community Survey
24   gives me the probability he would be working each year,

Page 57

1    but I combine that with data from the official U.S.
2    Life Tables that tell me the probability he would be
3    alive each year; and it's by combining those two sets
4    of information that I compute that.
5        Q   So the fact that you actually opined that he
6    had a cognitive nonsevere disability, that came from
7    the American Community Survey?
8        A   The data comes from the American Community
9    Survey.  The opinion that that is the limitation that
10   he has or the disability that he has would be mine.
11   Based upon the limitations I identified by Doctor
12   Ainsworth, I identified which definition of disability
13   I would apply from the American Community Survey.
14       Q   We discussed earlier the fact that you do --
15   the majority of your child cases are for a birth
16   injury, correct?
17       A   Yes.
18       Q   Are those physical and cognitive or mostly
19   cognitive?
20       A   Both.  I mean I mentioned brachial plexus,
21   which is a disruption of the brachial nerves going into
22   the arm.  So those would obviously be physical.  Some
23   have to do with hypoxic injury, which would be brain
24   injury.



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 58

1    Q   Okay.  How many of the child cases that you
2  normally deal with are for a cognitive nonsevere as
3  opposed to a cognitive severe?
4    A   It's hard for me to say in terms of child.  I
5  would say the majority of cognitive disabilities I look
6  at are nonsevere, but I can't really break it out from
7  child versus adult.
8    Q   You had mentioned that on page 42.  That's
9  the start of your detailed calculations?
10   A   Yes.
11   Q   And then you have three different types of
12 calculations.  You have the high school cognitive,
13 correct?
14   A   I've got essentially six different sets of
15 calculations; one for each of the three different
16 degrees -- or levels of education, I should say, split
17 out by two different post-injury work life
18 expectancies, so that two by three would be the six.
19   Q   What type of physical limitations did you
20 take into account when you calculated your findings?
21   A   That would go back to what we talked about
22 with Doctor --
23   Q   Again, that was a poor question.  I'm not
24 saying what type of neck pain, back pain.  Your

Page 59

1  cognitive was nonsevere.  Your physical -- I'm sure
2  there's sliding scales of the physical limitation,
3  physical disability.  Which one did you take into
4  account?
5    A   Here when I'm looking at the scenarios that
6  include the physical disability, it goes away from
7  being nonsevere to being somewhere in between.  When I
8  define a nonsevere disability with regard to work life
9  expectancy, I'm looking at somebody who answers
10 positively to the cognitive question but negatively to
11 all the others.  So here I'm looking at somebody who is
12 responding positively to two of the questions, both
13 cognitive and physical, but I'm still not making it
14 severe because I'm excluding anybody who reports
15 limitations in going outside of the home or in
16 self-care, so these are persons who have -- yeah, they
17 have troubles thinking.  They have troubles reaching,
18 lifting and carrying; but they don't report any
19 difficulties that would indicate they have troubles
20 getting outside the home or in self-care.
21   Q   And you had indicated that survey only took 1
22 percent of the population, which is 3 million people,
23 correct?
24   A   Say that again.

Page 60

1    Q   The survey that you're using for this data
2  took 1 percent of the population, which is 3 million
3  people?
4    A   Yeah, samples 1 percent of the population on
5  an annual basis.  I'm combining for the
6  physical-related data three years worth of data so I've
7  got a sample size of 9 million people.
8    Q   And how many of these 9 million actually
9  suffer from a nonsevere cognitive plus physical
10 disability?
11   A   The exact numbers I can't tell you.  It's a
12 very significant number.  Otherwise we wouldn't be able
13 to quantify it on an age-by-age basis as I do, but it
14 would be several thousand.
15   Q   Is there anywhere in your data that you would
16 be able to point to what that number is?
17   A   Not in what I brought with me, no.
18   Q   That would actually be in the -- actually it
19 wouldn't be contained within that survey because that's
20 something you extrapolated from it, correct?
21   A   It is within the survey but whether -- the
22 survey itself is this huge database.
23   Q   It's not tailored for your needs, correct?
24   A   Right.  So for me to answer specifically

Page 61

1  within that survey how many there would be, I'd have to
2  give you the results of my extraction to tell you how
3  many were.
4    Q   Which is back at your office?
5    A   Yes.
6    Q   But you did, in fact, use that for your
7  determination of ███████  correct?
8    A   Yes.
9    Q   That data and that calculation?
10   A   Yes.
11   Q   And you brought your file with you.  You gave
12 me your notes.  Fair to say that you do have data and
13 calculations that you use for ██████ that are not here
14 today?
15   A   Not -- I mean all the data that I used for
16 ██████ is here today.  The specific extraction of data
17 from the ACS I don't do on a case-by-case basis.  I
18 extract and have it available, and that data is
19 summarized in my file within the document identified as
20 Supporting Computations, and there's a page in there
21 that gives the participation employment rates that
22 I employed in the case.
23   Q   I don't know if I have that.  Where is that
24 at?



16 (Pages 58 to 61)

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 62

1    A   Was my file sent to you previously?
2    Q   No.
3    A   It's part of my file.  It's one of the
4 supporting pages in my file that I don't make part of
5 the report, but it's the data.  Within there's a
6 page that's titled Participation Employment Rates.
7        MS. SMITH:  Can I just state for the record
8    that we did have a rider to his deposition asking
9    for all nonprivileged portions of his file.  We
10   didn't receive that.
11 BY MS. SMITH:
12   Q   Do you have all that here with you today?
13   A   I do.
14   Q   So it would be possible for me to make a copy
15 of that before me leave?
16   A   Yeah.  Anything in my file that you want to
17 copy you can just take.  I can just reprint it at a
18 later date.
19   Q   I would ask specifically for that, for the
20 data that you just --
21   A   I'll give you this now.  I have two sets of
22 it.  I don't know if you want both.  One is for the
23 recent report, and one goes to the earlier report.
24   Q   I got it.  Okay.  So where on that page do

Page 63

1 you show the data for your -- you relied upon for your
2 calculation as to ████ having a nonsevere cognitive
3 plus physical disability?
4    A   And that would be -- when I print -- because
5 I keep everything electronically.  When I print, I
6 print in this case two pages per side.  So in essence
7 this would be two, four -- it would be on the sixth
8 page in, and that's where there's a page entitled
9 Participation Employment Rates.
10   Q   Okay.  Let me look at that.
11       MS. SMITH:  Do you want to take a break?
12       MR. HERNANDEZ:  Sure.  If you want to, that's
13   fine.
14       (Whereupon a short recess was had,
15        after which the preceding
16        deposition continued as follows:)
17 BY MS. SMITH:
18   Q   I had a chance to look at the data table that
19 you provided me, the one on page 6.  I see what you're
20 saying about there's a column here for males with a
21 high school grad cognitive with physical mobility
22 problems and then the same with some college and
23 Associate's degree; is that correct?
24   A   Yes.

Page 64

1    Q   Based on your prior testimony you have
2 extracted before what the participation in employment
3 rates would be for an individual with no high school
4 diploma.  You just don't have that in this table?
5    A   You mean in other cases, yes.
6    Q   Okay.  So this -- I guess that's why I'm
7 confused.  Before you said you don't extract data
8 specifically for this case.  You did not, you just had
9 it already prepared?
10   A   Yes.
11   Q   So I was wondering why -- if this table
12 wasn't extracted specifically for this case, why it
13 wouldn't include a column for an individual without a
14 high school education?
15   A   The data that I've extracted would fill 20
16 pages, so I only include the data on there that I'm
17 actually using in this case.
18   Q   Okay.  I have some questions about your other
19 report which you indicated that it's referred to as
20 a medical care cost summary, but it relates to the life
21 care plan, correct?
22   A   Yes, it does.
23   Q   And I'm going back and give you one more
24 question.  Sorry.

Page 65

1        There was a difference in an estimated
2 cost earnings between your first report in July of 2014
3 from your second report in July 2015; and it's my
4 assumption, correct me if I'm wrong, that there's a
5 difference because you had added the physical
6 disability along with the cognitive, correct?
7    A   There's actually a couple differences.  The
8 difference that you're referring to could be identified
9 merely like if you look on table 3 on page 6, the
10 cognitive and physical combination is what's added
11 there, so if you look at the other column that I've got
12 there that looks at just the cognitive disability, that
13 would be a direct comparison to what I provided
14 earlier; but it's not going to be the same.
15       And the reason that it's different comes
16 from two sources:  One is I'm using updated statistics,
17 different set of years from the ACS, so I'm using the
18 most modern.  That's going to give a slight change.
19 And another slight change comes from the passage of
20 time in that overall earnings have gone up from 2014,
21 when I originally did the report, to 2015.  So I'm
22 including that inflation in there.
23   Q   And if we compare these two charts -- two
24 tables that you just pointed us to, the years of his



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 66

1  work life expectancy decreased in your second report
2  because you added that physical component to it?
3      A   Yes.  They're talking about work life
4  expectancy would be table 2, and table 2 in the old
5  report, the cognitive disability column there would be
6  a direct comparison to do the cognitive disability and
7  modern report.  What's different is I've added the
8  cognitive physical disability.  So the differences
9  there in the work life expectancies both for no
10  disability and the cognitive only disability has to do
11  with using an updated set of data.  Oh, and also a
12  slight impact because ████ is still alive.  I would
13  have allowed for some small likelihood that ████ could
14  have predeceased that one year.
15      Q   So from July 2014 your low end of the range
16  for ████ vocational loss is 1,080,741, correct?
17      A   Yes.
18      Q   And then compared to July of 2014, the low
19  end of the range was 1 million 107,000 -- 107
20  366,000 -- no.
21      A   Can I say it?
22      Q   You do it.
23      A   I don't know why attorneys have trouble
24  saying that, but everybody does.  It's $1,107,366.

Page 67

1      Q   And then compare for me the high end of his
2  lost wages.
3      A   The high end using cognitive only, so the
4  direct comparison went from $1,332,752 to $1,428,333.
5  However, by adding on the physical component, the
6  adjusted high end is $1,644,422.
7      Q   Okay.  Now, I want to go to your -- so what
8  do you refer to this as, medical care cost summary?
9      A   Yeah, that's the standard name that our
10  company gives.  I'd rather call it just the present
11  value of a life care plan.
12      Q   Okay.  Now, you used Doctor Vogel's life care
13  plan in preparing this, correct?
14      A   Correct.
15      Q   All of your line entries, if we go back to
16  look at it, projected medical, psychological
17  evaluations, line entries for future medical,
18  psychological care, these were given by Doctor Vogel,
19  correct?
20      A   Yes, I rely upon Doctor Vogel to identify the
21  items, to identify what they currently cost and
22  identify their frequency and duration and need.  All
23  I'm doing is signing an inflation rate that I think
24  matches economic statistics and number crunching the

Page 68

1  values to find out what the present cash value is.
2      Q   You didn't change the amounts that Doctor
3  Vogel had projected for each individual service,
4  correct?
5      A   That's correct.  There's only -- the only
6  changes in what he would have is if he's projecting it
7  out over a lifetime.  If he -- his computations may not
8  be using the same duration because his -- he started
9  his as of the date of his report in 2014.  I'm starting
10  my projections as of the date of my report in 2015.
11      Q   So did you take into account that year that
12  was lost?
13      A   I'm basing it upon the current life
14  expectancy and noting that Mr. -- I'm sorry; that ████ o
15  is currently eight years old and so projecting 75 years
16  from the age of 8.
17      Q   So just so I'm clear, the year between Doctor
18  Vogel's estimates and your estimates, do we show that
19  ████ had this treatment?
20      A   I'm not projecting any treatment for that
21  past year.  So everything is starting as of July 15th.
22      Q   But the reason that your values are higher
23  than Doctor Vogel's is because you took into account
24  inflation and present value?

Page 69

1      A   Correct.
2      Q   Other than that, are there any other
3  differences between your estimate -- or your report and
4  Doctor Vogel's?
5      A   No.
6      Q   I had a question:  On all three of these
7  reports your name is listed as well as somebody else from
8  your firm?
9      A   Yes.
10      Q   The two vocational economic assessments
11  you're listed with a Sara Ford, MRC, correct?
12      A   Correct.
13      Q   Now, what did she do to help assist write the
14  report, if anything?
15      A   Ms. Ford's role is the same as Doctor
16  Missun's role on the life care plan, M-i-s-s-u-n.  Both
17  of them are backup signatures that to date have done no
18  work on the case at all.  Should something happen to
19  me, they would step in, rereview the materials,
20  reinterview if there was an interview on Ms. Ford's
21  side and carry on where I left off, but there's no
22  anticipation that they would need to.
23      Q   Okay.  Have you ever had any occasions where
24  your testimony at trial has been barred or limited?



MAGNA
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

## Page 70

1     A  No.

2     Q  Are you aware of anyone at Vocational

3 Economics that had the occasion where their testimony

4 was limited or barred at trial?

5     A  I'm aware of a few circumstances where

6 somebody has not been able to testify. And let me back

7 up just a little bit. By "limited" I think you're

8 meaning it correctly as saying that, no, we're not

9 going to let you give your opinion. We're always

10 limited. Maybe a doctor's -- some type of medical

11 evidence is not allowed into the trial and I can't talk

12 about that, so there's limitations in that regard.

13         But there have been a few instances,

14 Doctor Gamboa in a couple cases I know of, G-a-m-b-o-a,

15 had not been allowed to testify. I remember a case

16 involving Doctor Berla, B-e-r-l-a, several years ago

17 was not allowed to testify.

18     Q  You are not going to render any opinions as

19 to a causation in this matter, correct?

20     A  That's correct.

21     Q  And specifically the causation of ███

22 injury, if any?

23     A  That's correct.

24     MS. SMITH: I think that's all I have for

## Page 71

1 right now. I think I'm going to just look over my

2 notes.

3     MR. HERNANDEZ: I'd like to ask a few

4 questions.

5         CROSS EXAMINATION

6 BY MR. HERNANDEZ:

7     Q  First of all, regarding the American

8 Community Survey, is the American Community Survey

9 something that's commonly used in the vocational

10 economics field in determining future educational and

11 employment statistics?

12     A  Yes. In terms of researchers that look at a

13 number of areas, but including that the typical

14 educational outcomes and typical earnings outcomes and

15 typical probability of employment outcomes, it's used

16 on a very wide basis. It's the most widely used survey

17 of its nature in the world.

18     Q  And is the data contained in the American

19 Community Survey something that's commonly relied upon

20 by vocational economists used with determining the

21 earning capacity of a person with cognitive and

22 physical disabilities?

23     A  Yes. As a matter of fact, on my CV, at least

24 the most current version of my CV, is included No. 72,

## Page 72

1 which is a paper that I delivered to the U.S. Census

2 Bureau at the American Community Survey users group

3 that specifically is titled Use of ACS to Estimate

4 Lifetime Loss of Earning Capacity as a Result of

5 Disability, and it does look specifically at cognitive

6 disabilities and mobility disabilities.

7     Q  Counsel asked you if you had seen any updated

8 medical records for ███████████ indicating that

9 he's no longer taking pain medication. Do you remember

10 those questions?

11     A  I do.

12     Q  If you did see medical records or

13 documentation of that, would that in any way change

14 your opinions in this case?

15     A  No.

16     Q  And whether or not -- ███████████'

17 long-term need for medication, your opinions regarding

18 that you would defer to Doctor Glaser, correct?

19     A  I would.

20     Q  Counsel asked you if you were aware that

21 Doctor Vogel's exam was, quote unquote, normal. Does

22 that affect any of your opinions in this case?

23     A  No.

24     Q  Counsel asked you some questions about the

## Page 73

1 educational history of ███████ family and the impact

2 that that might have in his ability to obtain a high

3 school degree or further education. Do you remember

4 that line of questioning?

5     A  I do.

6     Q  Would any of the information that counsel

7 discussed with you regarding ███████ educational

8 history change any of your opinions in this case?

9     A  His family's educational history.

10     Q  I apologize, yes.

11     A  No.

12     Q  And with regard to -- counsel asked you if

13 you performed any tests yourself with ███████ correct?

14     A  Yes.

15     Q  Do you remember that questioning?

16     A  Yes.

17     Q  Were any of those tests necessary for your

18 evaluation of his vocational assessment?

19     A  Definitely not. The WRAT test was already

20 administered by Doctor Ainsworth, and plus Doctor

21 Ainsworth gave much more extensive testing than I could

22 ever be qualified of performing. The Career Assessment

23 Inventory is something that would be totally

24 inappropriate for an eight-year-old child, only seven



Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 74

1   years old at the time that I interviewed his mother.
2       Q   With regard to your report regarding the
3   present value of the life care plan, you testified that
4   you assigned inflation rates to the medical services
5   and treatments recommended by Doctor Vogel, correct?
6       A   I did.
7       Q   Can you explain a little bit about your
8   methodology in obtaining those inflation rates?
9       A   I looked to the U.S. Bureau of Labor
10  Statistics to identify the rate of inflation in the
11  United States. They track what's commonly known as
12  inflation through the Consumer Price Index for all
13  urban consumers, which is a general of inflation, but
14  they also have multiple subcomponents, items for
15  medical services as a whole, which are then broken down
16  into other subcategories such as medical commodities,
17  hospital service, professional services.
18          I use six different rates of inflation
19  that -- as measured by them, their long-term rate of
20  inflation and how it exceeds the general inflation
21  rate, and I match each of those six different
22  categories of inflation to the items that are in Doctor
23  Vogel's life care plan. So by using those six
24  different categories, I project how those different

Page 75

1   items in the life care plan will increase over time,
2   and I offset those items by the rate of interest I
3   would assign by looking at the long-term average in a
4   91-day treasury bill as measured by the federal reserve
5   board.
6          So those two rates offset to help
7   project the overall present cash value of an item where
8   some items, such as hospital services and the services
9   for a spinal cord stimulator which are identified in
10  the life care plan, will have a much higher rate of
11  growth than the general inflation rate; and they exceed
12  what the interest rate is considerably, which is why
13  the overall present value of the spinal cord stimulator
14  is about 984,000 versus the current cost of 295,000.
15  That's the single largest contributor why my overall
16  projections and present value terms would be higher
17  than what Doctor Vogel shows in current costs.
18          MR. HERNANDEZ: Okay. I think that's all I
19      have for right now.
20          MS. SMITH: Just a few.
21              REDIRECT EXAMINATION
22  BY MS. SMITH:
23      Q   Do you have an estimate as to how much you
24  will charge on this matter for your fees?

Page 76

1       A   For me?
2       Q   For your fees.
3       A   Oh, we talked about the two different flat
4   fees of the 28 and 45. So there's $7,300. I would
5   estimate for a deposition I probably bill about $2,500
6   on average by the time all the hours are accumulated,
7   and plus there is another hour and a half I think we
8   estimated for the updated Vocational Economic
9   Assessment, so if you remembered all those items and
10  add them together.
11      Q   One thing I didn't ask in more detail was
12  about your telephonic interview with Maria Gonzalez.
13  What was the purpose and what information did you
14  obtain from her?
15      A   Another document that you're free to take --
16      Q   Oh, yes, I have seen that.
17      A   -- of my notes with my interview with her.
18  But generally I confirmed the basic census information
19  ▮▮▮▮▮▮ date of birth, the members of the household,
20  the educational attainment which we've already talked
21  about, and talked about the injuries that ▮▮▮▮ had,
22  whether or not they still bother him, then talked about
23  the overall limitations from his injury where we
24  focused on the cognitive limitations that he has

Page 77

1   consistent with Doctor Ainsworth's report, but
2   basically just an affirmation of what I've already read
3   at that point, making sure that it's current at the
4   time of my report.
5          MS. SMITH: Okay. I'm going to enter this as
6      an exhibit. So this is the data you just provided
7      me today, the tables of data that you relied on.
8      I'm going to make this 7. And then I'm going to
9      make this other one, the Evaluee Interview Form
10     that you had with Maria Gonzalez, I'm going to
11     make that 8.
12  BY MS. SMITH:
13      Q   And then is there anything else in your file
14  that you might have that we haven't seen yet?
15      A   In terms of items that I would have generated
16  as opposed to been made available to you through
17  discovery, the supporting computations you have, that
18  was what we just marked as 7. My interview form is 8.
19          One item that I have in relationship to
20  the life care plan for Doctor Vogel would be this grid.
21  And here I print four pages per side, so I hope your
22  eyes are good. But that's essentially translating
23  Doctor Vogel's items into our spreadsheet to make sure
24  I've got them right to make sure I have them right



MAGNA ▶
LEGAL SERVICES

Redacted By: Merlo Kanofsky Gregg & Machalinski Ltd.

Page 78

1   before I do the actual computations.
2       Q   You didn't actually change anything?
3       A   No.
4       Q   And the actual computations for the
5   spreadsheet that you created, is that anywhere or is
6   that --
7       A   The actual computations were part of the
8   report that's attached to -- I don't know what exhibit
9   it was, but to the economics and life care plan.
10      Q   No notes or anything else that would have
11  been associated with those?
12      A   No.  And then let me just make sure there's
13  nothing else.
14          That should be it.
15      MS. SMITH:  Okay.  Perfect.  And then I'm
16  going to mark these, and I think that's all I
17  have.
18      MR. HERNANDEZ:  Okay.  Can we just take a
19  break for a second.  I want to consult with him,
20  and we should be able to finish up.
21          (Whereupon a short recess was had,
22              after which the preceding
23              deposition continued as follows:)
24      MR. HERNANDEZ:  All right.  Back on the

Page 79

1   record.  I have no further questions.
2       MS. SMITH:  Okay.
3           (Whereupon the deposition concluded
4               at 10:32 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 80

1
2
    STATE OF ILLINOIS  )
3                       ) SS.
    COUNTY OF C O O K  )
4
5
6           I, JOANNE M. GAGLIARDI, CSR, RPR, do
7   hereby certify that DAVID GIBSON, was by me first duly
8   sworn to testify to the truth, the whole truth, and
9   nothing but the truth, and that the above deposition
10  was recorded stenographically by me and reduced to
11  computer-aided transcription by me.
12          I FURTHER CERTIFY that the foregoing
13  transcript of the said deposition is a true, correct,
14  and complete transcript of the testimony given by the
15  said witness at the time and place specified
16  hereinbefore.
17          I FURTHER CERTIFY that I am not a
18  relative or employee or attorney or counsel of any of
19  the parties, nor a relative or employee of such
20  attorney or counsel, or financially interested directly
21  or indirectly in this action.
22
23
24

Page 81

1           I FURTHER CERTIFY that my certificate
2   annexed hereto applies to the original and typed
3   transcripts only, signed and certified transcripts
4   only.  I assume no responsibility for the accuracy of
5   any reproduced copies not made under my control or
6   direction.
7           IN WITNESS WHEREOF, I have hereunto set
8   my hand this 10th day of August, 2015.
9
10  _____
    Certified Shorthand Reporter
11  Registered Professional Reporter
    C.S.R. No. 084-002466
12
13
14
15
16
17
18
19
20
21
22
23
24



21 (Pages 78 to 81)